## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANTHONY BLACK, *et al*,

    Plaintiffs,

       v.

PENNY SUE PRITZKER, Secretary,
U.S. Department of Commerce, *et al*,

    Defendants.

Civil Action No. 14-782 (CKK)

## MEMORANDUM OPINION
(August 10, 2015)

Plaintiffs, Anthony Black, American Triumph LLC, Matthew James Freitas, Sea Quest LLC, Benjamin Maughan, Jr., Ocean Conquest LLC, Keith Bass, Jr., Ocean Encounter LLC, Paul Magellan, Sea Honor LLC, John Zolezzi, and Pacific Ranger LLC, bring this action against Defendants, Penny Sue Pritzker, in her official capacity as Secretary of the U.S. Department of Commerce ("Secretary"), and Kathryn D. Sullivan, in her official capacity as Administrator of the National Oceanic and Atmospheric Administration ("NOAA Administrator"), to review the final decisions of the NOAA Administrator imposing civil penalties on Plaintiffs for violations of the Western and Central Pacific Fisheries Convention Implementation Act ("WCPFCIA"), 16 U.S.C. § 6901, *et seq.*, and/or the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361, *et seq.* Specifically, Plaintiffs, owners and operators of six U.S. flag tuna purse seine fishing vessels, seek an order setting aside each of the civil penalty determinations, totaling approximately $1,500,000. Presently before the Court are the parties' cross-motions for summary judgment. Upon

consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court

GRANTS Defendants' [18] Motion for Summary Judgment and DENIES Plaintiffs' [16] Motion

for Summary Judgment.  Accordingly, judgment shall be entered for Defendants.

# I. BACKGROUND

### A.      Statutory and Regulatory Framework

            1.      *Western and Central Pacific Fisheries Convention Implementation Act*

In 2007, the United States ratified the Convention on the Conservation and Management

of Highly Migratory Fish Stocks in the Western and Central Pacific Ocean ("Convention").

III.G.58 at 003539.[2]  One function of the Convention is to adopt Conservation and Management

Measures ("CMMs") for members and participants of the Convention to implement through their

national laws and procedures.  *Id.* at 003541.  The Western and Central Pacific Fisheries

Convention Implementation Act ("WCPFCIA"), 16 U.S.C. § 6901, *et seq.*, provides the authority

for the Secretary of Commerce ("Secretary"), in consultation with the Secretary of State and the

Secretary of the Department in which the Coast Guard is operating, to develop regulations to carry

out the obligations of the United States under the Convention, including the implementation of

---

[1] While the Court bases its decision on the record as a whole, its consideration has focused on the following documents: Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. [16]; Pls.' Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem."), ECF No. [16-1]; Defs.' Combined Opp'n to Pls.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J. ("Defs.' Opp'n & Cross-Mot."), ECF No. [19]; Pls.' Combined Reply in Supp. of Mot. for Summ. J. and Opp'n to Defs.'s Cross-Mot. for Summ. J. ("Pls.' Reply & Opp'n to Cross-Mot."), ECF No. [20]; and Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. [22].  The motion is fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision.  *See* LCvR 7(f).

[2] To maintain consistency, the Court shall cite the Administrative Record in the same manner that the parties use in their briefing.  Accordingly, citations are by section (I, II, or III), subsection (A, B, C, etc.), document number within subsection (1, 2, 3, etc.), and Bates or document page number.  *See* Pls.' Mem. at 4 n.1; Defs.' Opp'n & Cross-Mot. at 2 n.1.

CMMs. 16 U.S.C. § 6904(a). The Secretary has delegated this authority to the National Marine Fisheries Services ("NMFS"), a component of the National Oceanic and Atmospheric Administration ("NOAA") within the Department of Commerce. III.G.58 at 003541. Further, the enforcement of violations of the WCPFCIA are governed by the penalty provisions of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"). 16 U.S.C. § 6905(c).

At issue in the instant action is CMM 2008-01, the Conservation and Management Measure for Bigeye and Yellowfin Tuna in the Western and Central Pacific Ocean, which was adopted by the Commission in December 2008. Pursuant to CMM 2008-01, specific provisions target reducing fishing mortality on bigeye tuna and controlling fishing mortality on yellowfin tuna by reducing the risk of overfishing during certain periods of time in 2009, 2010, and 2011. III.G.58 at 003541. Specifically, CMM 2008-01 prohibited purse seine fishing[3] on Fish Aggregation Devices ("FADs") between: August 1, 2009, and September 30, 2009; July 1, 2010, and September 30, 2010; and July 1, 2011, and September 30, 2011. III.I.1 at 003723-25. FADs were defined in CM 2008-01 as "any man-made device, or natural floating object, whether anchored or not, that is capable of aggregating fish." *Id.* at 003721 n.1. In addition to the prohibition on the use of FADs, CMM 2008-01 also required that during the specified periods of time, all purse seine vessels engaged in fishing were to carry on board an observer from the Regional Observer Program to monitor that the vessel did not deploy or service any FAD or associated electronic devices or fish on schools in association with FADs. *Id.* at 003723.

---

[3] A purse seine is a "floated and weighted encircling net that is closed by means of a drawstring threaded through rings attached to the bottom of the net." III.F.10 at 002691.

The NMFS proposed a regulation ("FAD Regulation") to implement the requirements of CMM 2008-01.  The proposed rule and request for comments was published on June 1, 2009, and the final regulation was published by the National Oceanic and Atmospheric Administration ("NOAA") on August 4, 2009.  III.H.1 at 003702.  The final regulation indicated that the FAD prohibition period for 2009 would run from August 3, 2009, to September 30, 2009, despite the fact the regulation was not published in its final form until August 4, 2009. *Id.*  As part of the published final regulation, the NMFS also addressed comments that it had received in response to the publication of the proposed rule.  The following comment and response is relevant to the instant action:

> *Comment 5:* During a FAD prohibition period, the following activities should not be prohibited: (1) in situations in which there are no FADs in the area of the fishing vessel, capturing a school of tuna that has aggregated under the fishing vessel; [and] (2) capturing fish that are in the vicinity of a floating object but not associated with the object . . . .

> *Response:* Regarding activity (1), the commenter's view is consistent with the intent of the proposed rule; however, NMFS will revise the final rule to clarify that the meaning of a FAD does not include the purse seine vessel itself. Having said that, it is important to note that under the proposed rule it would be prohibited during a FAD prohibition period to set a purse seine in an area into which fish were drawn by a vessel from the vicinity of a FAD.   Regarding activity (2), NMFS does not agree. Although fish may indeed be found in the vicinity of a FAD but not necessarily associated with it, NMFS finds that in order to ensure that fishing on schools in association with FADs does not occur, it is necessary to also prohibit fishing on schools that are merely in the vicinity of FADs. Under the proposed rule, this would be accomplished by prohibiting setting a purse seine within one nautical mile of a FAD.

*Id.* at 003704.

In relevant part, the final regulation provided that the owners, operators, and crew of fishing vessels of the United States during the specified period shall not:

(1) Set a purse seine around a FAD or within one nautical mile of a FAD.

4

(2) Set a purse seine in a manner intended to capture fish that have aggregated in association with a FAD, such as by setting the purse seine in an area from which a FAD has been moved or removed within the previous eight hours, or setting the purse seine in an area in which a FAD has been inspected or handled within the previous eight hours, or setting the purse seine in an area into which fish were drawn by a vessel from the vicinity of a FAD.

(3) Deploy a FAD into water.

(4) Repair, clean, maintain, or otherwise service a FAD, including any electronic equipment used in association with a FAD, in the water or on a vessel while at sea except that:

    (i)    A FAD may be inspected and handled as needed to identify the owner of the FAD, identify and release incidentally captured animals, un-foul fishing gear, or prevent damage to property or risk to human safety; and

    (ii)    A FAD may be removed from the water and if removed may be cleaned, provided that it is not returned to the water.

*Id.* at 003714. Based on the comments to the proposed regulation, the NMFS revised the definition of a FAD "to clarify that it does not include a fishing vessel, provided that the fishing vessel is not used for the purpose of aggregating fish." *Id.* at 003710. As such, a FAD was defined in the final version of the regulation as "any artificial or natural floating object, whether anchored or not and whether situated at the water surface or not, that is capable of aggregating fish, as well as any objects used for that purpose that are situated on board a vessel or otherwise out of the water. *The meaning of FAD does not include a fishing vessel, provided that the fishing vessel is not used for the purpose of aggregating fish.*" *Id.* at 003712-13 (emphasis added). The final FAD Regulation also implemented the requirement that an observer be on board any vessel that was engaging in fishing during the specified time periods. *Id.* at 003713.

    2.    *Marine Mammal Protection Act*

The Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361, *et seq.*, makes it unlawful "for any person subject to the jurisdiction of the United States or any vessel or other conveyance subject to the jurisdiction of the United States to take any marine mammal on the high sea." 16 U.S.C. § 1372(a)(1). "Take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* at § 1362(13). Further, the MMPA defines "harassment" as "any act of pursuit, torment, or annoyance which (i) has the potential to injure a marine mammal or marine mammal stock in the wild; or (ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id.* at § 1362(18)(A).

Relevant to the instant action is the exception under the MMPA for the incidental taking of marine mammals during commercial fishing operations. Pursuant to 16 U.S.C. § 1387(a)(2), marine mammals may be taken incidentally in the course of commercial fishing operations and the Secretary of Commerce may issue annual permits to United States purse seine fishing vessels for the incidental taking of marine mammals. *See* 16 U.S.C. § 1374(a) & (h). The Secretary is required to issue regulations to address the use of the annual permits. *Id.* at § 1374(h).

Pursuant to 16 U.S.C. § 1387, the Secretary was required to classify fisheries into one of three categories for the purposes of the incidental take authorizations. The Secretary found the western and central Pacific Ocean was a fishery with "occasional incidental mortality and serious injury of marine mammals." 16 U.S.C. § 1387(c)(1)(A)(ii). As such, the owner or authorized representative of a fishing vessel was required to possess a valid Certificate of Authorization in order to lawfully incidentally take marine mammals in the course of commercial fishing operation. 50 C.F.R. § 229.4(a)(1). The Certificate of Authorization provides authorization for "the

*incidental, but not intentional,* taking of marine mammals." 50 C.F.R. § 229.2 (emphasis added). The regulations promulgated by the Secretary defined "incidental" as "a non-intentional or accidental act that results from, but is not the purpose of, carrying out an otherwise lawful action." 50 C.F.R. § 229.2.

   **B.    Factual and Procedural Background**

   Plaintiffs are captains and owners of six vessels who were issued Notices of Violation ("NOVAs") by NOAA in 2010, based on alleged violations of the FAD Regulation and the MMPA during fishing trips taken between August and September of 2009.  Specifically, the NOVAs were issued to: (1) Anthony Black, American Triumph LLC, and Yen Ming Yuan of the F/V American Triumph ("AT Plaintiffs"); (2) Matthew James Freitas, Sea Quest LLC, and Ching Wen Wu of the F/V Sea Quest ("Sea Quest Plaintiffs"); (3) Benjamin Maughan, Jr., Ocean Conquest LLC, and Wu Chia Pin of the F/V Ocean Conquest ("Ocean Conquest Plaintiffs"); (4) Keith Bass, Jr., Ocean Encounter LLC, Ho-Ching Chang of the F/V Ocean Encounter ("Ocean Encounter Plaintiffs"); (5) Paul Magellan, Sea Honor LLC, and Yen Hsing Tasai of the F/V Sea Honor ("Sea Honor Plaintiffs"); and (6) John Zolezzi, Pacific Ranger LLC, and Su Tien Shih of the F/V Pacific Ranger ("Pacific Ranger Plaintiffs").

   On September 29, 2010, NOAA issued NOVAs against each of the six sets of Plaintiffs finding: (1) eight violations of the FAD Regulation on the part of the AT Plaintiffs and assessing total penalties for these violations at $872,500, I.A.1 at 0000004-10; (2) two violations of the FAD Regulation on the part of the Sea Quest Plaintiffs and assessing total penalties at $253,750, II.A.1 at 0003979-82; (3) one violation of the MMPA and two violations of the FAD Regulation on the part of the Ocean Conquest Plaintiffs and assessing total penalties at $267,750, *id.* at 0003989-93; (4) four violations of the MMPA and five violations of the FAD Regulation on the part of the

Ocean Encounter Plaintiffs and assessing total penalties at $657,750, *id.* at 0004000-06; (5) two violations of the FAD Regulation on the part of the Sea Honor Plaintiffs and assessing total penalties at $160,000, *id.* at 0004013-16; and (6) one violation of the FAD Regulation on the part of the Pacific Ranger Plaintiffs and assessing total penalties at $117,500, *id.* at 0004023-26.

Each of the Plaintiffs requested a hearing before an Administrative Law Judge ("ALJ") for an independent determination as to whether the violations occurred and, if so, an independent assessment of the penalties.  NOAA proceeded with two cases against Plaintiffs. The AT Plaintiffs comprised one case and the Sea Quest Plaintiffs, Ocean Conquest Plaintiffs, Ocean Encounter Plaintiffs, Sea Honor Plaintiffs, and Pacific Ranger Plaintiffs (collectively, the "Consolidated Plaintiffs") comprised the other case.

Plaintiffs filed Motions to Dismiss in both cases, arguing that the NMFS improperly made the FAD Regulation effective immediately upon publication in the Federal Register, and its reasons for waiving the requirement that an agency observe a 30-day delay between the publication of the final regulation and the effective date of the regulation as proscribed under the Administrative Procedure Act ("APA") were arbitrary and capricious.  As such, Plaintiffs argued that the FAD Regulation was not enforceable until September 5, 2009, 30 days after August 4, 2009, the date of publication in the Federal Register, and that all counts related to alleged FAD Regulation violations prior to September 5, 2009, should be dismissed.  I.A.29 at 0000348-58; II.A.38 at 0004458-67.

The ALJ denied the Motions to Dismiss on the basis that the issue was within the authority of the NOAA Administrator ("Administrator"), and not the ALJ, to decide. II.A.46 at 0004576. The ALJ granted Plaintiffs' Application for Interlocutory Review of the issue by the Administrator.  II.A.51 at 0004656.  The Administrator found that the NMFS had good cause to

make the regulation effective immediately and, accordingly, that the waiver of the 30-day delay was done in compliance with the APA.  As such, the Administrator held that NOAA may prosecute alleged violations that occurred within 30 days of the publication of the final version of the FAD Regulation.  II.A.87 at 0005165-70.   The two matters then proceeded to hearings before the ALJ. The Court shall discuss the proceedings for each set of Plaintiffs in turn.

1. *The AT Plaintiffs*

The hearing related to the AT Plaintiffs took place before an ALJ on January 31, 2012, July 9-11, 2012, and August 27-28, 2012.  The Agency presented seven witnesses and 20 exhibits, and the AT Plaintiffs offered four witnesses and 26 exhibits.  I.A.84 at 0001403.  On August 22, 2013, the ALJ issued the Initial Decision and Order, finding that seven of the eight violations of the FAD Regulation were proven.  *Id.* at 0001402.  Specifically, the ALJ found that during the FAD closure period, the AT Plaintiffs had violated the FAD Regulation by servicing a FAD on one occasion, making a set within one nautical mile of a FAD on three occasions, and making a set on a FAD on three occasions.  The ALJ found in one instance that it was not proven that the AT Plaintiffs made a set within one nautical mile of a FAD.  *Id.* at 0001442.  As a result, the ALJ found that a sanction of $562,068.27 was appropriate for the seven violations that were proven. *Id.* at 0001402, 0001477.

On November 25, 2013, the ALJ entered an order denying the AT Plaintiffs' Petition for Reconsideration of the Initial Decision and Order.  I.A.92 at 0001705-16.  On April 14, 2014, the NOAA Administrator denied the AT Plaintiffs' Petition for Administrator Review of the Initial Decision and Order, and modified the ALJ's Initial Decision to vacate a portion of the order with respect to a fishing master that is not at issue in the instant matter.  I.B.101 at 0002231.  The Administrator adopted all other parts of the Initial Decision, including the order awarding

monetary civil penalties without modification. *Id.*  The Administrator's decision became the final decision of the Secretary. *Id.* at 0002232.

2.   *The Consolidated Plaintiffs*

The hearings related to the violations of the Consolidated Plaintiffs took place before the ALJ on February 1-2, 2012, July 11-12, 2012, August 23-24, 2012, and October 29, 2012.  The Agency presented 14 witnesses and 65 exhibits, and the Consolidated Plaintiffs offered eight witnesses and 37 exhibits.  II.A.100 at 0005465.  On August 23, 2013, the ALJ issued the Initial Decision and Order, finding that all alleged violations against the Consolidated Plaintiffs were proven. *Id.* at 0005463.  Specifically, the ALJ found that it was proven that: (1) the Sea Quest Plaintiffs violated the FAD Regulation by making a set within one nautical mile of a FAD on two occasions and, as a result, assessed a penalty of $147,959.68; (2) the Pacific Ranger Plaintiffs violated the FAD Regulation by making a set within one nautical mile of a FAD on one occasion and, as a result, assessed a penalty of $41,699.50; (3) the Ocean Conquest Plaintiffs violated the MMPA by making a set on a whale on one occasion and violated the FAD Regulation by making a set within one nautical mile of a FAD on two occasions and, as a result, assessed a penalty of $215,776.77; (4) the Ocean Encounter Plaintiffs violated the MMPA by making a set on a whale on four occasions and violated the FAD Regulation by making a set within one nautical mile of a FAD on five occasions and, as a result, assessed a penalty of $497,617.98; and (5) the Sea Honor Plaintiffs violated the FAD Regulation by servicing/deploying a FAD on two occasions and, as a result, assessed a penalty of $50,000. *Id.* at 0005462-63.

On December 6, 2013, the ALJ entered an order denying the Consolidated Plaintiffs' Petition for Reconsideration of the Initial Decision and Order.[4]  II.A.107 at 0005886.  On April 14, 2014, the NOAA Administrator denied the Consolidated Plaintiffs' Petition for Administrator Review of the Initial Decision and Order, and modified the ALJ's Initial Decision to vacate a portion of the order with respect to a fishing master that is not at issue in the instant matter. II.B.114 at 0006556-58.  The Administrator adopted all other parts of the Initial Decision, including the order awarding monetary civil penalties without modification.  *Id.* at 0006558. The Administrator's decision became the final decision of the Secretary.  *Id.*

The owners and operators of all six vessels, the F/V American Triumph, the F/V Sea Quest, the F/V Ocean Quest, the F/V Ocean Encounter, the F/V Sea Honor, and the F/V Pacific Ranger, bring the instant action for judicial review of the final decisions of the Secretary pursuant to 16 U.S.C. § 1858(b).  The six fishing masters who were parties in the administrative proceedings have not sought judicial review.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." However, "when a party seeks review of agency action under the [Administrative Procedure Act before a district court], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record .

---

[4] The ALJ altered two references in the Initial Decision to the "F/V Ocean Conquest" to reflect that the references are actually to the "F/V Ocean Encounter." II.A.107 at 0005886.

. . Summary judgment is [ ] the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the [Administrative Procedure Act] standard of review." *Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).

This case involves the review of agency decisions under both the Magnuson-Stevens Act and the Administrative Procedures Act ("APA"). The standard of review for agency decisions under the Magnuson-Stevens Act is borrowed from the APA. *See* 16 U.S.C. § 1858(b) ("The findings and order of the Secretary shall be aside by such court if they are not found to be supported by substantial evidence, as provided in section 706(2) of [the APA]."). The APA provides in pertinent part that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence." 5 U.S.C. § 706(2). The APA also provides that courts should set aside decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* The "substantial evidence" standard and the "arbitrary and capricious" standard "require equivalent levels of scrutiny." *Mem'l Hosp./Adair Cnty. Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987). The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The D.C. Circuit has recognized that, in applying the substantial evidence test, an agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005). Normally, a decision will be reversed for lack of substantial evidence "only when the record is so compelling that no reasonable

factfinder could fail to find to the contrary." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009), *cert. denied*, 558 U.S. 822 (2009) (citation and quotation marks omitted). "[J]udicial review under the substantial evidence test is ultimately deferential." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 705 (1980). The agency's decision is presumptively valid, and the court is not authorized to substitute its own judgment for that of the agency. *Id.* The Court's review is limited to the administrative record. *Bloch v. Powell*, 227 F. Supp. 2d 25, 30 (D.D.C. 2002).

A reviewing court can also set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D). An agency's decision may be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

In reviewing agency decisions, the court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The court's "task is not to decide which among several competing interpretations best serves the regulatory purpose." *Id.* Rather, the agency's interpretation is controlling "unless it is plainly erroneous or inconsistent with the regulation." *Id.* (citations omitted).

13

# III. DISCUSSION

Plaintiffs raise several challenges to the Secretary's final decisions in both the proceedings. Specifically, Plaintiffs argue that: (1) the Administrator erred in finding that NOAA properly waived the 30-day delay between the publication of the FAD Regulation and its effective date; (2) the definition of a FAD in the regulation was vague and ambiguous; (3) NOAA's interpretation of the MMPA was contrary to the plain meaning of the statute; (4) the ALJ's findings were unsupported by substantial evidence because the ALJ made improper credibility determinations and failed to properly weigh the evidence before him, and, relatedly, the Administrator's adoption of the findings as final was arbitrary and capricious for the same reasons; and (5) the penalties assessed against each of the Plaintiffs were excessive under the circumstances. The Court shall address the each of Plaintiffs' first three arguments and then the Court shall address the ALJ's credibility determinations and analysis, and the Administrator's adoption of the ALJ's findings for each of the six sets of Plaintiffs. Finally, the Court shall address the penalties assessments for each of the Plaintiffs and the Administrator's adoption of the same as the final decision of the Secretary.

## A. Waiver of the 30-Day Notice Period Pursuant to the APA

Plaintiffs first allege that NOAA failed to demonstrate good cause to waive the 30-day delay between the publication of the FAD Regulation in the Federal Register and the effective date of the Regulation. Plaintiffs argue that the FAD Regulation should not have been effective until September 5, 2009, 30 days after the date of publication, and, as such, all counts based on alleged violations that occurred prior to that time should be dismissed.[5] Pls.' Mem. at 17. Pursuant to 5

---

[5] Specifically, all but one count against the AT Plaintiffs was based on conduct that occurred prior to September 5, 2009. Further, one count against the Sea Quest Plaintiffs was based on a FAD violation occurring prior to that date.

U.S.C. § 553(d), "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . as otherwise provided by the agency for good cause found and published with the rule." *Id.* at § 553(d)(3).

On August 4, 2009, the final version of the FAD Regulation was published in the Federal Register and made effective as of August 3, 2009.  The following notice of the waiver of the 30-day period was published with the Regulation:

> There is good cause under 5 U.S.C. 553(d)(3) to waive the 30-day delay in effective date for all of this final rule except §§ 300.222(aa) and 300.223(f) (the sea turtle migration requirements and associated prohibitions). Compliance with the 30-day delay requirement would be impracticable and contrary to the public interest the FAD prohibition period and associated observer requirement would be in effect for only about half of the specified period in 2009, meaning that NMFS would be frustrated in promulgating the regulations needed to satisfy the international obligations of the United States under the Convention. Also, NMFS had limited notice of the need to implement CMM 2008-01, which was adoption in the December 2008 regular annual session of the WCPFC.

III.H.1 at 003710.  Plaintiffs raise two objections to the notice.  First, Plaintiffs argue that the reasons set forth in the notice do not meet the "good cause" requirement under the APA for waiving the 30-day notice period.  Pls.' Mem. at 17-21.  Second, Plaintiffs argue that during the interlocutory review of this issue, the Administrator erroneously relied on different reasons than those set forth in the published notice to justify waiver of the 30-day period.  *Id.* at 21-22.  The Court shall address each argument in turn.

Turning to Plaintiffs' first argument, Plaintiffs assert that NOAA's contention that compliance with the 30-day delay requirement was "impracticable" lacks merit, and that in reality NOAA was unable to meet the 30-day delay requirement because of its own "foot-dragging" during the process.  Pls.' Mem. at 19-20.  Further, Plaintiffs assert that recognizing the 30-day delay would not have been "contrary to public interest" and, instead, the failure to recognize the

delay ignored the public interest of the fishermen who were subject to the Regulation by failing to give them an opportunity to take reasonable measures to comply. *Id.* at 20. As such, Plaintiffs argue that NOAA has failed to demonstrate good cause to waive the 30-day notice requirement under the APA.

In contrast, Defendants argue that the lengthy administrative record in this matter demonstrates that NOAA did not drag its feet in enacting the Regulation and that Plaintiffs had notice of the effective date of the Regulation when NOAA published the proposed version of the Regulation on June 1, 2009. Defs.' Opp'n & Cross-Mot. at 23-25. Accordingly, Defendants assert that NOAA properly demonstrated good cause to waive the 30-day notice period and otherwise complied with its obligations under the APA in order to do so. For the reasons described herein, the Court finds that the reasons for waiving the 30-day period as published with the FAD Regulation satisfy the requirements of 5 U.S.C. § 553(d)(3).

As an initial matter, Plaintiffs, relying on the United States Court of Appeals for the District of Columbia Circuit's opinion in *American Federation of Government Employees v. Block*, argue that the proscribed period can be waived under the APA only if observing the delay would be "impracticable, unnecessary, or contrary to the public interest." *See* Pls.' Mem. at 17 (quoting *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1158 (D.C. Cir. 1981)). However, as Defendants properly point out, that standard is applicable to an agency's waiver of the notice requirement for *proposed rulemaking* pursuant to 5 U.S.C. § 553*(b)* and not to the provision of the statute at issue in the instant action. Here, the Agency waived the requirement that the final rule be published not less than 30 days prior to its effective date pursuant to 5 U.S.C. § 553*(d)*.

Indeed, the D.C. Circuit in *American Federation of Government Employees*, indicated that while both provisions of the statute require the agency to show "good cause" to waive the

prescribed time periods, "different standards govern the applicability of the good cause exceptions to these requirements."  655 F.2d at 1156.  Specifically, the D.C. Circuit contrasted the purposes of the rules:

> Both the requirement of 553(b) that notice of proposed rulemaking be published in the Federal Register and the requirement of 553(d) that publication of a rule be made at least thirty days prior to its effective date serve the laudable purpose of informing affected parties and affording them a reasonable time to adjust to the new regulation. Section 553(b) serves, however, the even more significant purpose of allowing interested parties the opportunity of responding to proposed rules and thus allowing them to participate in the formulation of the rules by which they are to be regulated.

*Id.*  As such, the D.C. Circuit concluded that "the more detailed language of section 553(b)(B) which provides that an agency may forego notice-and-comment procedures in this context only upon a finding that such procedures are 'impracticable, unnecessary, or contrary to the public interest,'" and noted that it did not "break new ground [by holding], based upon the language of the APA and the underlying purposes of the subsections at issue, that what may constitute good cause to forego one notice requirement may not satisfy the other."  *Id.*  (citation omitted).  While Plaintiffs argue that the cited portions of the opinion discussing the requirement for waiving the notice-and-comments period are instructive because NOAA cited "impracticality" and "public interest" as its justification for waiving the 30-day delay between publication and the effective date of the Regulation, such a reading is not supported by the plain language of the opinion.   Instead, the D.C. Circuit has made clear that the requirements for showing good cause under § 553(b), not at issue in this case, and under § 553(d), which is at issue in this case, are different.  As such, the Court will analyze Plaintiffs' claim by applying the standard set forth for determining whether good cause has been shown pursuant to § 553(d).

17

"[T]he exceptions to the provisions of section 553 'will be narrowly construed and only reluctantly countenanced.'" *Am. Fed'n of Gov't Emps.*, 655 F.2d at 1156. "[T]he purpose of the thirty-day waiting period [pursuant to § 553(d)] is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996). Accordingly, "[i]n determining whether good cause exists, an agency should 'balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'" *Id.* (quoting *United States v. Gavrilovic*, 551 F.2d 1099, 1105 (8th Cir. 1977)).

In the Federal Register, NOAA provided that observing the 30-day delay period would be both impracticable and contrary to public interest because it would put the agency in a position to fail to meet its international obligations under the Convention, namely its obligation to impose the FAD Regulation effective as of August 1, 2009. As previously discussed, CMM 2008-01 required member countries to implement regulations prohibiting purse seine fishing on FADs from August 1, 2009, to September 30, 2009. As described in the published explanation, if the 30-day notice period was not waived, the Regulation would have been effective as of September 5, 2009, more than halfway through the period prescribed by the Convention. Here, the Agency's need to immediately implement the regulations in order for the United States to comply with its international treaty obligations outweighs the need to provide the affected persons with a reasonable amount of time to prepare to comply with the regulation.

While the Court finds that compliance with the United States' treaty obligations is sufficient to support a "good cause" showing, the Court shall address two other issues raised by the parties in their briefing that support this conclusion. As Defendants note, Plaintiffs did have

notice prior to the publication of the final version of the regulation that NOAA planned to enact

the FAD Regulation effective August 1, 2009.  *See* Defs.' Opp'n & Cross-Mot. at 24-25.  Indeed,

when NOAA published the proposed rule on June 1, 2009, it sent a copy to U.S. purse seine vessel

owners, including Plaintiffs.   The proposed rule as published in the Federal Register was

accompanied by a cover letter dated June 1, 2009, that provided:

> In order for the United States to satisfy its obligations under the Convention, the proposed FAD prohibition period and associated observer requirement must be made effective by August 1, 2009. Depending upon when the final rule is issued, NMFS may need to consider shortening or waiving the 30-day delayed effectiveness provision of the Administrative Procedures Act (APA) so that the FAD prohibition period and associated observer requirement are implemented on schedule. APA Section 553(d) provides that "The required publication or service of a substantive rule shall be made not less than 30 days before its effective date," with certain exceptions. One exception to the normal 30-day waiting period is "for good cause found and published with the rule." *If NMFS finds good cause to shorten or waive the 30-day delayed effectiveness period for the 2009 prohibition period and associated observer requirement in order to comply with the international obligations of the United States under the Convention, those elements of the proposed rule could become effective as early as the date of publication of the final rule, which would follow NMFS' consideration of public comments on the proposed rule.* We anticipate all other elements of the proposed rule would be subject to the normal 30-day waiting period before coming into effect.

> *In this regard, please be prepared to implement the proposed 2009 FAD prohibition period and associated observer coverage requirements by August 1, 2009.*

III.F.1 at 002502-03 (emphasis added); *see also* III.F.2-F.8 at 002504-17.  Plaintiffs do not contest

that these letters were sent along with a copy of the proposed rule and an invitation to provide

comments.  *See* Pls.' Reply & Opp'n to Cross-Mot. at 4.  Plaintiffs argue that the letter simply

advised them that if good cause was found, then the rule *could* become effective upon publication.

*Id.*  This argument is contradicted by the clear directive set forth in the letter, advising Plaintiffs to

"please be prepared to implement the proposed 2009 FAD prohibition period and associated

observer coverage requirements by August 1, 2009."  III.F.1-F.8 at 002502-17.

19

Further, while Plaintiffs are correct that the fact that they were on notice of the forthcoming regulation "does not absolve NOAA of its statutory obligations under the APA," Pls.' Reply & Opp'n to Cross-Mot. at 4, it is relevant in determining whether Plaintiffs were provided a reasonable amount of time to prepare for the implementation of the regulation when the 30-day notice period was waived pursuant to § 553(d).  *See Omnipoint Corp.*, 78 F.3d at 630.  Here, the letter sent to Plaintiffs two months prior to the effective date of the final regulation gave them notice that a final version of the rule might be effective on August 1, 2009.[6]  Further, as the Administrator noted in her Order, "[i]n all respects relevant to the violations at issue, the requirements in the final rule were the same as those contained in the proposed rule."[7]  II.A.87 at 0005169.

Plaintiffs argue that the administrative record demonstrates that NOAA dragged its feet in enacting the regulation, while Defendants contend that the administrative record shows that this claim is without merit.  *Compare* Pls.' Mem. at 18-20 *with* Defs.' Opp'n & Cross-Mot. at 23.  For the reasons described herein, the Court finds that NOAA's need to waive the 30-day notice period was not based on its own dilatory efforts.  As NOAA noted in its description of its reasons for waiving the 30-day notice requirement, it only became aware of the requirement to enact the regulation in December 2008, when CMM 2008-01 was adopted by the Convention.  The administrative record reflects that in January 2009, NOAA was in the rulemaking process.  III.A.3

---

[6] Both the captain of the F/V Triumph and the F/V Sea Quest testified during the administrative proceedings that they were aware of the FAD Regulation. I.C.108 at 0002818 (testimony of Plaintiff Black, Captain of F/V American Triumph); II.C.121 at 0007300 (testimony of Plaintiff Freitas, Captain of the F/V Sea Quest).

[7] As the Administrator noted in her Order, and the parties noted in their briefing, the final version of the rule differed from the proposed version of the rule in that the definition of a FAD was modified to be *less* restrictive in response to a public comment received during the June 2009, notice-and-comment period.

at 000917-23.  At that time, NOAA identified May 1, 2009, as the target date for the proposed

rule, and set forth a plan to publish the proposed rule in May 2009 and the final rule in June 2009.

III.A.7 at 000934; III.A.11 at 000942.  Indeed, a preliminary outline of the NOAA's National

Environmental Policy Act compliance documents, purpose and need statement, and alternatives

for its environmental assessment were circulated in February 2009, III.B.13 at 001052-54, and a

first draft of the proposed rule was circulated internally in March 2009, III.C.21 at 001171-89.

Prior to the publication of the proposed regulation NOAA also: issued its federal

consistency determinations required under the Coastal Zone Management Act, III.C.31-34 at

001206-28; provided notice to the Western Pacific Fisheries Management Council of its planned

FAD Regulation, III.D.20 at 001515-16; documented compliance with the MMPA and the

Endangered Species Act, III.D.61-62 at 001882-86; prepared a Regulatory Impact Review under

the Regulatory Flexibility Act, III.E.1-E.2 at 001970-96; and completed the Essential Fish Habitat

consultation required under the Magnuson Act, III.E.4-5 at 002037-40.

The NOAA General Counsel provided clearance of the proposed rule on May 12, 2009,

and the Department of Commerce General Counsel cleared the proposed rule on May 26, 2009.

III.E.26 at 002303; III.E.27 at 002305.  On June 1, 2009, the proposed regulation and request for

comments was published in the Federal Register, III.F.10 at 002684-94, and the Draft

Environmental Assessment were made publicly available, III.F.9 at 002518-683.  The proposed

rule was open to comment from June 1, 2009, to June 22, 2009.  III.F.10 at 002684.  At the

conclusion of the comment period, NOAA drafted responses to 28 public comments that it received

and revised the proposed regulation based on the comments.  The final FAD Regulation was

published in the Federal Register on August 4, 2009.  III.H.1 at 003702-16.

As Defendants contend, a review of the extensive administrative record demonstrates that NOAA was not dilatory in its actions with respect to the FAD Regulation.  Instead, as described above, the record reflects that NOAA started working on the FAD Regulation shortly after CMM 2008-01 was adopted by the Convention in December 2008.  However, NOAA was still not able to meet its timetable for publishing the proposed rule in time to receive public comment and publish the final regulation 30 days prior to the August 1, 2009, enactment date.  After reviewing the record, NOAA then made the determination that there was good cause to waive the 30-day notice period in light of the United States' treaty obligations.  Accordingly, the Court finds that for the reasons published in the Federal Register, there was good cause to waive the 30-day delay pursuant to § 553(d).  Further, the Court finds that contrary to Plaintiffs' assertion, NOAA's need to waive the 30-day period was not the result of the Agency's dilatory efforts to implement the regulation.

Next, the Court turns to Plaintiffs' argument that the Administrator improperly relied on reasons outside of the notice published with the FAD Regulation to find that there was good cause to waive the 30-day delay.  When the issue of NOAA's waiver of the 30-day notice requirement was submitted to the Administrator for interlocutory review, the Administrator found that NOAA waived the period for good cause consistent with the requirements of the APA.  Specifically, the Administrator explained:

> I conclude the NMFS acted appropriately by invoking the good cause exemption and making the final rule effective immediately. NMFS was required to have regulations in force by August 1, 2009, in order to give effect to CMM 2008-01. Failure to meet this firm deadline would have resulted in serious harm. It would have compromised necessary conservation efforts intended to reduce fishing pressure on Bigeye and Yellowfin tuna. *Moreover, the United States would have failed in its obligation under the Treaty to timely implement a conservation and management measure of the Commission.*

II.A.87 at 0005168 (emphasis added).  The Administrator reiterated: "I find that NMFS had good cause to make the final rule effective immediately.  NMFS was confronted with a firm deadline for having regulations in place. Failure to meet this deadline would have caused real harm by failing to timely impose an important conservation measure and *meet international treaty obligations*." *Id.* at 0005169 (emphasis added).

Plaintiffs contend that Administrator improperly relied on conservation concerns to support a finding of good cause when such concerns were not in the explanation published with the FAD Regulation pursuant to 5 U.S.C. § 553(d).[8]  Pls.' Mem. at 21-22; Pls.' Reply & Opp'n to Cross-Mot. at 6.  The Court finds this argument is without merit as NOAA in its published explanation of the waiver, the Administrator in her Order, and, as discussed above, this Court all found that NOAA had a good cause basis pursuant to § 553(d) to waive the 30-day notice period in order to meet the United States' treaty obligations.  To the extent that the Administrator may have also relied on the overall purpose of the FAD Regulation, i.e., the conservation efforts, to support NOAA's waiver of the 30-day period, the Court finds that this is not a basis to set aside the Administrator's decision, particularly in light of this Court's own analysis of the issue.[9]  Accordingly, the Court finds that NOAA complied with the notice requirement of the APA pursuant to 5 U.S.C. § 553(d) when it waived the 30-day notice period for good cause.

**B.      Definition of FAD**

---

[8] To the extent that Plaintiffs in their briefing hone in on NOAA's use of the words "impracticable" and "public interest" in the explanation published in the Federal Register, the Court considers the entirety of the explanation as published including the reference to the need to satisfy the international obligations of the United States under the Convention.  *See* Pls.' Mem. at 18-21; Pls.' Reply & Opp'n to Cross-Mot. at 3-4.

[9] Further, as Defendants note in their Reply, "Plaintiffs [do not] cite any authority that prohibited the Administrator from considering whether additional considerations justified the agency's invocation of the good cause exception." Defs.' Reply at 13.

23

Next, Plaintiffs bring a due process claim, arguing that the FAD Regulation is unconstitutionally vague because it failed to give fair notice to Plaintiffs of the prohibited conduct. Specifically, Plaintiffs argue that "NOAA's definition [of a FAD] created ambiguity as to what activities NOAA prohibited with respect to 'fish-under-the-boat' or other sets involving the use of lights as part of the vessel's routine safety and fishing operations." Pls.' Mem. at 23. As such, Plaintiffs argue that the 13 counts brought against the Consolidated Plaintiffs for "fish-under-the-boat" sets should be dismissed. *Id.* at 24. For the reasons described herein, the Court finds that the definition of a FAD is not unconstitutionally vague and that the conduct found by the ALJ, namely the purposeful use of lights under the vessel or workboat to aggregate fish, falls within the definition of a FAD.

Parties dispute whether the ALJ properly found that the fishing vessel or an auxiliary workboat was a FAD within the meaning of the definition when the ALJ found that lights were used to aggregate fish under the boats. Plaintiffs argue that the Agency improperly found that they violated the FAD Regulation on 13 occasions based on sets made on fish that had aggregated under the fishing vessel itself and/or under auxiliary workboats. Specifically, Plaintiffs contend that the definition of a FAD does not include the fishing vessel or a workboat even if lights were used. Further, Plaintiffs assert that the lights were used for safety purposes, not for the purpose of aggregating fish. However, Defendants argue that while the FAD Regulation did not prohibit setting on tuna that "accumulated naturally" under the vessel, the Plaintiffs' violations were based on sets where the main vessel used onboard lights for the purpose of drawing fish toward the vessel and/or the main vessel deployed auxiliary workboats with submerged lights to draw fish away from the main vessel and hold them in place while the main vessel made a set. Defs.' Opp'n &

Cross-Mot. at 37. Defendants contend that the use of lights to attract fish transformed the vessel or workboats into a FAD under the definition set forth in the regulation. *Id.*

Indeed, in addressing Plaintiffs' argument, the ALJ found that while the regulations at the time did not specifically discuss the use of lights, "under the definition of a FAD, the regulations included 'any objects' used for the purpose of aggregating fish that are situated on board a vessel or otherwise out of the water. Objects like lights used by the main vessel to aggregate fish overnight and/or lights used by the vessel's auxiliary workboats to hold the fish in place fall into this broad definition." II.A.87 at 0005512 (internal citation omitted). As such, the ALJ concluded under the regulations that "[u]sing objects, like lights, to aggregate the fish or hold them in place while a set was made transforms the vessel into a FAD under the 2009 regulations." *Id.* at 0005513. After finding that using lights to aggregate fish under the fishing vessel or a workboat and then making a set on those fish was prohibited by the FAD Regulation, the ALJ found all counts related to "fish-under-the-boat" were proven. In addressing Plaintiffs' motion for reconsideration, the ALJ explained that he "rejected the contention that these sets involved fish naturally aggregating under the vessels with no efforts made by Respondents to draw fish under the boat." II.A.107 at 0005880. The Administrator did not further discuss this issue in denying Plaintiffs' Petition for Administrative Review. *See* II.B.114 at 0006556-59.

In the proposed version of the FAD Regulation, published in the Federal Register on June 1, 2009, NOAA explained: "FADs would be defined to include both artificial and natural floating objects that are capable of aggregating fish." III.F.10 at 002686. However, the definition was altered in the final version of the rule in response to a public comment that was received during the notes-and-comments period under the APA. Specifically, the comment that was published with the final rule read in relevant part: "During a FAD prohibition period, the following activit[y]

should not be prohibited: . . . in situations in which there are no FADs in the area of the fishing

vessel, capturing a school of tuna that has aggregated under the fishing vessel." II.H.1 at 003704.

In response to the comment, NOAA explained: "[T]he commenter's view is consistent with the

intent of the proposed rule; however, *NMFS will revise the final rule to clarify that the meaning of

a FAD does not include the purse seine itself.* Having said that, it is important to note that it would

be prohibited during a FAD prohibition period to set a purse seine in an area into which fish were

drawn by a vessel from the vicinity of a FAD." *Id.* (emphasis added).  Accordingly, the definition

was revised and the final version follows:

> Fish aggregating device, or FAD, means any artificial or natural floating object,
> whether anchored or not and whether situated at the water surface or not, that is
> capable of aggregating fish, as well as any objects used for that purpose that are
> situated on board a vessel or otherwise out of the water. *The meaning of FAD does
> not include a fishing vessel, provided that the fishing vessel is not used for the
> purpose of aggregating fish.*

III.H.1 at 003712-13.

The issue before this Court is whether the definition of a FAD is unconstitutionally vague

such that it violates the requirements of due process.  "A vague rule 'denies due process by

imposing standards of conduct so indeterminate that it is impossible to ascertain just what will

result in sanctions.'" *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993) (quoting *Hastings v.

Judicial Conference of the U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987)). "In reviewing regulations for

vagueness, [the court] must decide only 'whether the regulation 'delineated its reach in words of

common understanding.'" *Throckmorton v. Nat'l Transp. Safety Bd.*, 963 F.2d 441, 444 (D.C. Cir.

1992) (citation omitted).  "Further, when considering a vagueness challenge to a 'regulation

promulgated pursuant to remedial civil legislation . . . we must do so 'in the light of the conduct

to which it is applied,' allowing 'greater leeway' for regulations and statutes governing business

activities than those implicating the first amendment." *Id.* at 444-45 (citation omitted). Indeed, "[i]n order to satisfy constitutional due process requirements, regulations must be sufficiently specific to give regulated parties adequate notice of the conduct they require or prohibit." *Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997). "Accordingly, regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Id.*

Here, in the notes-and-comments section published with the final rule, NOAA indicated that the definition of a FAD was revised to clarify that the meaning of a FAD does not include the purse seine itself. However, the actual definition of a FAD set forth that "[t]he meaning of FAD does not include a fishing vessel, *provided that the fishing vessel is not used for the purpose of aggregating fish*." III.H.1 at 003713. From the plain language of the regulation, it is clear that a fishing vessel could fall within the definition of a FAD if it is used for the purpose of aggregating fish. As such, Plaintiffs cannot reasonably argue that they were not on notice that some conduct on their part may render the fishing vessel itself to be a FAD within the meaning of the regulation. While the regulation does not provide any specific examples of conduct that would constitute a use for the purpose of aggregating fish, the agency is not required to do so as long as the regulation provides fair warning of its requirements. *See Freeman*, 108 F.3d at 362 ("The courts have recognized, however, that 'specific regulations cannot begin to cover all of the infinite variety of . . . conditions which employees must face,' and that 'by requiring regulations to be too specific [courts] would be opening up large loopholes allowing conduct which should be regulated to escape regulation.'") (citation omitted); *DiCola v. FDA*, 77 F.3d 504, 509 (D.C. Cir. 1996) ("[I]t

is often sufficient, so far as due process is concerned, 'that the proscription mark out the rough area of prohibited conduct, allowing law-abiding individuals to conform their conduct by steering clear of the prohibition.'") (citation omitted).

As explained in the proposed version of the regulation, "the objectives of CMM 2008-01 include achieving, over the 2009-2011 period, a reduction in the fishing mortality on bigeye tuna in the WCPO of at least 30 percent and no increase in fishing mortality on yellowfin tuna in the WCPO, relative to a specified historical baseline." III.F.1 at 002685.  Further, it is clear that in order to achieve this goal, the FAD Regulation prohibited all scenarios where a purse seine is set in a manner that intends to capture fish that have aggregated in association with a FAD.  *See* III.H.1 at 003702.  Here, the Court must decide whether Plaintiffs had fair warning that using lights to attract fish to the fishing vessel itself and/or to an auxiliary workboat would render the vessel or boat a FAD under the regulation.[10]  In light of the purpose of the regulation and the regulation's clear complete ban on the use of FADs, the Court finds that a reasonably prudent person would have been on fair notice that use of lights for the purpose of aggregating fish was conduct prohibited under the regulation.

---

[10] Plaintiffs note in a more recent version of the FAD Regulation, NOAA expressly prohibited setting on fish that naturally accumulated under the vessel overnight and described prohibited use of lights. Pls.' Reply & Opp'n to Cross-Mot. at 8-9 (citing 78 Fed. Reg. 30773 (May 23, 2013)).  Defendants point out that NOAA described that the changes made to the 2009 rule included a new prohibition on making a set on fish that naturally accumulated under the vessel, conduct that was permitted under the 2009 rule. As the ALJ explained, the revisions also "'amplif[ied] the prohibitions established in the 2009 rule by explicitly prohibiting use of lights in specific manners that are known to be used to aggregate fish.'"  Defs.' Reply at 10 (quoting II.A.100 at 005513).  The fact that the 2009 version of the regulation was revised to specifically address the use of lights does not necessarily render the 2009 rule unconstitutionally vague. Instead, it simply demonstrates that NOAA sought to provide some specific examples with respect to the use of lights.

As Plaintiffs concede, "'[f]ish-under-the-boat' sometimes (but not always) occurs when a vessel has been floating overnight and the crew wakes up in the early morning to discover that fish have naturally accumulated under the vessel." Pls.' Mem. at 23. Neither party argues that under the 2009 version of the regulation it was prohibited to make a set on a tuna that had naturally accumulated under the boat. *See id.* at 22; Defs.' Opp'n & Cross-Mot. at 37. However, at least some testimony in the record reflects that it was practice in the industry to use lights on the workboat to attract fish from the vessel in order to make a set on the fish. *See* II.C.121 at 0007305 (testimony of Robert Virissimo, Vice President of Vessel Operations of the South Pacific Tuna) (describing the practice and noting that everyone in the industry has a "little different system" with respect to the use of lights to make a set on fish that are found under the vessel). Indeed, while not determinative, the record reflects that the Agency on at least one occasion prior to the enactment of the regulation advised another party that it understood that the use of lights by a workboat would meet the definition of a FAD. *See, e.g.*, II.E.128-70 at 0009526K (email from NOAA employee to Mr. Virissimo dated July 27, 2009, indicating "Also, you say no FAD involved however I think if they used a light boat to draw the fish away from the boat, it is still considered a FAD set as you are aggregating fish away from the vessel, to the light boat, and using it as a FAD"). While this evidence is not determinative, it is illustrative of the fact that a reasonably prudent person would have fair warning that using lights for the purpose of aggregating fish either around the fishing vessel or a workboat would be prohibited under the regulation based on the definition of a FAD. As such, the Court shall deny Plaintiffs' request for summary judgment because the Court does not find the regulation's definition of a FAD unconstitutionally vague.

The Court bears in mind that there is a dispute among the parties with respect to whether the lights were actually used to aggregate fish or whether they were used for safety or some other

purpose.  In this section, the Court has only addressed whether the purposeful use of lights to aggregate fish would render a fishing vessel or auxiliary workboat as a FAD under the definition. The Court shall address whether or not Plaintiffs actually purposefully used the lights to aggregate fish in its discussion *infra* of the ALJ's findings with respect to each of the counts.

###    C.    Interpretation of the MMPA

Plaintiffs contend that the NOAA regulation defining the term "incidental" in the commercial fishing provisions of the MMPA is inconsistent with other regulations and with the text of the statute.  Specifically, Plaintiffs argue that the term "incidental take" in the MMPA "clearly contemplates that, where the sole purpose of commercial fishing is to harvest fish and not marine mammals, NOAA may authorize the incidental taking of marine mammals even where the taking is a virtual certainty, and even intentional."  Pls.' Mem. at 55.  In support of this argument, Plaintiffs assert that when Congress intended to prohibit a taking that is "incidental, but not intentional," it included that language in the statute.  *Id.*  Plaintiffs argue that because the language regarding "intentional" takes was not included in this portion of the statute addressing commercial fishing, Congress intended the term "incidental" to include "intentional" takes in this context.  *Id.* As such, Plaintiffs argue that the regulation defining "incidental" to mean "a non-intentional or accidental act," 50 C.F.R. § 229.2, is inconsistent with other regulations and the text of the statute. Pls.' Mem. at 56.  Further, Plaintiffs argue that the Agency's definition is inconsistent with its definition of an "incidental catch" which includes "the taking of a marine mammal . . . as a consequence of the steps used to secure the fish in connection with commercial fishing operations." *Id.* (quoting 50 C.F.R. § 216.3).  Accordingly, Plaintiffs argue that even if the ALJ's findings with respect to the MMPA violations are upheld, the counts should be dismissed nonetheless because at most, the takings were "incidental" and, thus, not prohibited.

The Court agrees with Defendants that NOAA's interpretation of the MMPA to exempt only the *unintentional, incidental* take of marine mammals by commercial fishers in the course of commercial fishing is reasonable. *See* Defs.' Opp'n & Cross-Mot. at 49. The Court notes that "[a]s a general matter, an agency's interpretation of the statute which that agency administers is entitled to *Chevron* deference." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). In the first step of the *Chevron* analysis, the Court reviews the statute de novo to determine whether or not the statute is ambiguous. *Chevron*, 467 U.S. at 842-43. If the statute is ambiguous, the Court then must defer to the agency's interpretation of the statute unless it is "manifestly contrary to the statute." *Id.* at 844. Thus, the inquiry for the Court under the second step of *Chevron* is whether the agency's interpretation of Congress' instructions is reasonable. The Court's inquiry under the second step of *Chevron* "overlaps with [the Court's] inquiry under the arbitrary and capricious standard." *Am. Fed'n of Gov't Employees, AFL–CIO, Local 446 v. Nicholson*, 475 F.3d 341, 345-46 (D.C. Cir. 2007). "Whether a statute is unreasonably interpreted is close analytically to the issue whether [sic] an agency's actions under a statute are unreasonable." *Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000).

Plaintiff, the party challenging the agency action, bears the burden of proof. *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)). In assessing the merits of Plaintiffs' challenge, the Court begins with the presumption that the agency's actions were valid. *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002). So long as the agency decision has some rational basis, the Court is bound to uphold it. *Hosp. of Univ. of Penn. v. Sebelius*, 634 F.

Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Here, the Court first addresses the issue of whether the statute is ambiguous. "[T]he incidental taking of marine mammals in the course of commercial fishing operations by persons using vessels of the United States or vessels which have valid fishing permits issued by the Secretary [of Commerce]" is regulated under the provisions of 16 U.S.C. § 1387(a)(2). The term incidental is not defined by statute. However, the regulations promulgated by the Secretary defined "incidental" as "a *non-intentional* or *accidental* act that results from, but is not the purpose of, carrying out an otherwise lawful action." 50 C.F.R. § 229.2 (emphasis added).

First, the Court notes that the statute itself supports a definition of "incidental" that excludes intentional conduct. Indeed, while the statute expressly prohibits the "intentional lethal take of any marine mammal in the course of commercial fishing operations," 16 U.S.C. § 1387(a)(5), the Secretary was permitted to allow "incidental taking," *id.* at § 1387(c)(2)(C). However, the owner or operator of a commercial fishing vessel was required to report "all incidental mortality and injury of marine mammals in the course of commercial fishing operations." *Id.* at § 1387(e). As such, it is clear that Congress, by banning all "intentional" instances of mortality but requiring the reporting of all "incidental" incidents of mortality understood the terms to cover different conduct.

Further, as Defendants point out, a common meaning of "incidental" is "occurring merely by chance or without intention or calculation." *See* Defs.' Opp'n & Cross-Mot. at 50 n.9 (citing Merriam Webster Dictionary, http://www.merriam-webster.com/dictionary/incidental (last visited Oct. 31, 2014)); *see also FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009) ("It is fixed law that words of statutes or regulations must be given their 'ordinary, contemporary, common

meaning.'") (citation omitted).   As such, the regulatory definition as limited to non-intentional or accidental acts conforms with the common meaning of the term.   Nonetheless, the Court notes that another definition of "incidental" included in the same source cited by Defendants, defines the term as "happening as a minor part or result of something else."   Merriam Webster Dictionary, http://www.merriam-webster.com/dictionary/incidental (last visited Aug. 10, 2015).   This definition supports Plaintiffs' argument that the common meaning of the term includes "intentional" acts.   As such, the Court shall at least consider the second step of the *Chevron* analysis in the interest of completeness.

In the second step, the Court must defer to the agency's interpretation of the statute unless it is manifestly contrary to the statute.   As such, the Court must determine whether the agency's interpretation of Congress' instructions is reasonable.   Congress explained the purpose of enacting the MMPA in the statute: "[I]t is the sense of the Congress that [marine mammals] should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem." 16 U.S.C. § 1361(6).   The NOAA's regulations interpreting the statute as permitting the incidental, but not intentional, take of mammals are both reasonable and consistent with the language, structure, and purpose of the MMPA.[11]

The Court bears in mind that there is a dispute among the parties with respect to whether the takings at issue in the instant action meet the definition of incidental as set forth in the

---

[11] Plaintiffs contend that they have authorization to incidentally take whales under the MMPA and, accordingly, cannot be punished for the conduct at issue. Pls.' Reply & Opp'n to Cross-Mot. at 18-19. As discussed further *infra*, the ALJ here found that Plaintiffs' conduct was not incidental.

regulation.  In this section, the Court has *only* addressed whether the Agency's definition of the term "incidental" is valid.  The Court shall address whether or not Plaintiffs actually saw the whales prior to making the set in its discussion *infra* of the ALJ's findings with respect to each of the counts.

### D.  ALJ's Findings of FAD Regulation and MMPA Violations

Plaintiffs raise specific objections to the ALJ's findings with respect to each of the violations at issue.  The Court shall address each argument in turn, first discussing the violations found proven for the AT Plaintiffs and then discussing the violations found proven for the Consolidated Plaintiffs. However, the Court first notes with respect to all of the credibility determinations, the Court recognizes that the ALJ had the opportunity to observe the demeanor of the witnesses who testified before him.

#### 1.  *American Triumph Plaintiffs*

Plaintiffs argue that there are overarching issues with the credibility determinations of the ALJ with respect to the violations of the F/V American Triumph as adopted as the final agency decision in this matter.  Plaintiffs also raise specific objections to the ALJ's findings with respect to each count, which Plaintiffs argue are not supported by substantial evidence.  The Court shall first address the ALJ's credibility determination and then shall turn to Plaintiffs' arguments regarding each count found proven against the AT Plaintiffs.

##### a.  ALJ's Credibility Determinations

Specifically, the crux of Plaintiffs' argument with relation to the ALJ's credibility determinations is that the ALJ improperly credited the testimony of Jason Morikawa, who was the observer on board the vessel under the Regional Observer Program, over the conflicting testimony of Plaintiff Black, the vessel's captain, and Indra "Cucu" Cahyana, the interpreter on board the

vessel. *See* Pls.' Mem. at 26-41. Plaintiffs argue that the ALJ should not have credited the testimony of Morikawa because evidence reflected that Morikawa believed that he might get an award for reporting violations and that Morikawa used betel nut, a substance prohibited on board the vessel. Plaintiffs also argue that the ALJ improperly credited testimony that Morikawa was bribed by the fishing master on board the vessel so that he would not report the sets made on FADs. Instead, Plaintiffs assert that the ALJ should have credited what they argue is the more reliable testimony of Cahyana and of Plaintiff Black, who Plaintiffs argue has an incentive to be honest because he is subject to federal licensing, was cooperative during the investigation, and has no prior violations. Contrary to Plaintiffs' assertions, the Court finds no reason to set aside the findings because the ALJ fully considered the information that Plaintiffs present in their motion in reaching his decision to credit the accounts of the incidents provided by Morikawa. The ALJ's findings, ultimately adopted by the Agency, include clear and comprehensive credibility determinations based on consideration of the conflicting evidence in the record.

"[A]bsent clear error, 'an agency's credibility decision normally enjoys almost overwhelming deference.'" *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 81 (D.D.C. 2011) (quoting *Sasol N. Am. Inc. v. Nat'l Labor Relations Bd.*, 275 F.3d 1106, 1112 (D.C. Cir. 2002)). Indeed, as the D.C. Circuit has noted, the court is "loathe to overturn the credibility determinations of an ALJ unless they are 'hopelessly incredible, self-contradictory, or patently insupportable.'" *Noel Canning v. NLRB*, 705 F.3d 490, 495 (D.C. Cir. 2013) (citation omitted). Further, "[t]he reviewing court may not substitute its own judgment for the agency's 'choice between two fairly conflicting views,' even if that court 'would justifiably have made a different choice had the matter been before it *de novo*.'" *Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010) (citation omitted)

Case 1:14-cv-00782-CKK   Document 33   Filed 08/10/15   Page 36 of 63


Here, the ALJ set forth specific explanations of his credibility determinations with respect to Morikawa, Black, and Cahyana. I.A.84 at 0001425-31. As the ALJ noted, the testimony of the witnesses was contradictory and irreconcilable. *Id.* at 0001425. The ALJ explained:

> To make credibility determinations at issue, I considered the totality of the circumstances, including: 1) my observations of each witness' demeanor, candor, and responsiveness; 2) the plausibility of a particular witness' account; 3) the consistency between any of the witness' written accounts (and the timing of such accounts) and oral statements; 4) the internal consistency of each such statement; 5) the consistency of such statements with any other record evidence; and 6) any demonstrated inaccuracies in such statements.

*Id.*

In his credibility determination of Morikawa, the ALJ discussed both the allegations with relation to the bribe and the use of betel nut. *Id.* at 0001414-17. In his credibility determination, the ALJ found that the fishing master attempted to bribe Morikawa to not to report his observations of unlawful activity, and that Morikawa accepted the money with the express intent of keeping it as evidence to support his documentation of the events in his trip diary. The ALJ noted that Morikawa turned over the money ($440) following the trip and received a $2,000 award after the fact for reporting the bribe.[12] *Id.* at 0001426.

In the instant motion, Plaintiffs argue that the ALJ improperly found that Morikawa was bribed and instead should have relied on deposition testimony demonstrating that the incident was actually a simple miscommunication between the fishing master and Morikawa who misunderstood a word in Chinese to be "raft," which he took to mean a FAD. The ALJ addressed

---

[12] Morikawa turned over the money he received from the fishing master to his observer coordinator. The Marshall Islands Government subsequently charged the American Triumph LLC and the fishing master with interfering with an observer. The American Triumph LLC and the fishing master settled the charges by paying a $200,000 to the Marshall Islands Government, and Morikawa received a $2,000 reward as a result of the settlement. *See* I.A.84 at 001415-16.

this argument in his motion for reconsideration, noting "[Plaintiffs] raise for the first time the deposition transcript of Mr. Morikawa (which was not admitted into evidence during the hearing – nor used as impeaching material) and cite to extra-record definitions of the word 'raft' in Chinese." I.A.92 at 0001711. Plaintiffs argue that the testimony from Cahyana and Black supports a finding that the money was not a bribe but rather was "happy money" that the fishing master regularly gave to crew members for good luck. *See* Pls.' Mem. at 30. Further, Black testified that he had a conversation with Morikawa about another boat that had gotten in trouble for an alleged bribe and that rewards were given as a result.[13] I.C.108 at 00002819. Notably, the testimony cited in support of Plaintiffs' argument discusses the fishing master's general practice of giving out money but both Cahyana and Black specifically testified that they never saw the fishing master give money to Morikawa. I.C.108 at 0002807, 0002826-27. Black testified he "assumed" the fishing master gave Morikawa the money for good luck. *Id.* at 0002826. Further, the fishing master did not testify before the ALJ. The Court cannot conclude that the ALJ improperly credited Morikawa's account of the alleged bribe and related notes taken by Morikawa over the accounts of two persons who admittedly did not witness the exchange of the money. Further, the Court cannot conclude that the ALJ improperly factored this information into the credibility determination.

Plaintiffs next argue that the ALJ's ruling with respect to Morikawa's alleged use of betel nut in violation of the Code of Conduct for Observers while on board the vessel was arbitrary and

---

[13] Plaintiffs appear to cite to this testimony in support of their argument that Morikawa had an economic incentive to report the FAD violation, not the bribe. *See* Pls.' Mem. at 28. However, a reading of the transcript makes clear that the discussion was about a bribe "before the FAD closure." I.C.108 at 00002819. As such, the Court shall address this testimony in this section of the opinion and not in the discussion of whether the ALJ should not have credited Morikawa's testimony because he had an economic incentive to report the *FAD violations*.

capricious.  Pls.' Mem. at 30-31.  Contrary to Plaintiffs' assertion, the ALJ did consider conflicting testimony from Cahyana that Morikawa used betel nut during the trip at issue, and Morikawa's denial of same.  I.A.84 at 0001428.  Ultimately, the ALJ credited Morikawa over Cahyana given his determination of Morikawa's credibility and noted that even if the assertion regarding the betel nut was true, "[P]laintiffs failed to demonstrate that such use more likely than not leads to the conclusion that all of his documentary exhibits and testimony are not credible."  *Id.*  While Plaintiffs argue that Morikawa's alleged use of betel nut and denial of the use are relevant to his character and truthfulness, the ALJ clearly set forth the evidence that he considered and determined that Morikawa should be credited over Cahyana.  As such, the ALJ rejected this attack on Morikawa's credibility.  The Court does not find this ruling arbitrary and capricious.  Rather, the ALJ was required to resolve conflicting testimony and did so with a reasonable explanation that he found Morikawa more credible for the reasons described in his findings.

Turning to Morikawa's alleged monetary incentive for reporting FAD violations, the ALJ noted that Morikawa received $2,000 for reporting the bribe but did not receive any award for reporting the FAD violations.  *Id.* at 001426-27.  However, Plaintiffs appear to argue that Morikawa thought that he would receive rewards for reporting FAD violations even though the record reflects that he did not receive any such award.  *See* Pls.' Mem. at 28-29.  Plaintiffs point out that Cahyana testified that both Morikawa and one of Morikawa's friends told him that they received "big money" for reporting violations. I.C.108 at 0002813.  Further, Plaintiffs also rely on two statements from Morikawa himself that Plaintiffs contend are inconsistent.  First, Morikawa provided the following written responses to the questions sent to him by Special Agent Painter as part of the NOAA investigation of the FAD violations:

1. Prior to making your trip on the American Triumph, were you ever instructed to try and note as many violations as you can, because you would receive a percentage of the fines or penalties imposed?

   - Yes Kevin, everything I said was true but too bad I didn't bring any camera to get more solid evidences.

2. If so, who gave you the instruction?

   - No one.  As a trained observer I learned that we observers should collect everything data including/especially the ones that are *ILLEGAL.*

I.E.112-JJ at 0003903.  Further, a second set of written responses to these same questions that constituted Morikawa's final answers is included in the record.  In response to question 1, Morikawa answered: "I didn't know about receiving any reward money for reporting violations, until after I returned from my trip on the American Triumph. After reporting the violations I was made aware of the possibility of an award."  *Id.* at 0003908.  In response to question 2, Morikawa answered: "No one gave me any instructions. I just did what I was trained to do."  *Id.*

Plaintiffs point to Morikawa's first response to question 1 in the affirmative as inconsistent with the response given in the other set of questions.  The ALJ found that the allegedly inconsistent statement was reasonable as "Morikawa apparently misunderstood the question and was answering about his then-present knowledge (i.e., after the trip where the bribery occurred)" and then corrected it in the final version.  I.A.84 at 0001427.  Further, the ALJ found that the complete answer to questions 1 and 2 supported Morikawa's credibility, citing to the portion of the answer where Morikawa indicated that "no one" gave him instructions to document violations in order to receive an award.  *Id.*  The Court does not find answering the question in the affirmative in the first instance necessarily contradictory because Morikawa goes on to indicate that he was truthful in his report.  Further, the testimony of Cahyana that Morikawa told him he would receive money

for reporting violations does not provide a basis for the Court to set aside the ALJ's finding. The ALJ credited Morikawa's account that he was not aware that he might receive an award for reporting FAD violations, a conclusion that is supported by the record and fully explained by the ALJ.

Ultimately, the ALJ found "Morikawa's testimony to be credible and supported by contemporaneous documents he generated that are consistent with his testimony."[14]   *Id.* at 0001429.  Based on a review of the cited evidence, the Court does not find that the ALJ's credibility determination with respect to Morikawa was hopelessly incredible, self-contradictory, or patently insupportable. *See Noel Canning*, 705 F.3d at 495.  Instead, the determination appears to be supported by substantial evidence and a review of the evidence cited by Plaintiffs does not demonstrate that the ALJ's finding should be disturbed.

Plaintiffs' arguments regarding the ALJ's credibility determinations with respect to Black and Cahyana similarly fail.  Plaintiffs assert that the ALJ should have credited the testimony of Black over the testimony of Morikawa because Black "had the greatest reasons to testify honestly in this proceeding."  Pls.' Mem. at 31. Plaintiffs argue that Black's testimony should have been

---

[14] Plaintiffs assert that under the memorandum of understanding governing the observer program, the vessels' captains were to be afforded an opportunity to review and comment on the observers' reports.  Plaintiffs argue that they were prejudiced by NOAA's failure to provide an opportunity to comment particularly in light of the fact that the ALJ relied in part on the observers' reports because they were made contemporaneously to the events at issue.  *See* Pls.' Reply & Opp'n to Cross-Mot. at 12-13.  However, as Defendants noted, the memorandum of understanding at issue was between the Pacific Islands Forum Fisheries Agency (FFA) and the American Tuna Owners Association (ATA), and NOAA was not a party to the memorandum. *See* I.E.112O at 0003683.  As such, the Court cannot conclude that there was any error on Defendants' part in not soliciting contemporaneous responses to the observers' notes, but rather contacting the vessels' captains after the fact as part of the investigation.  Further, while the ALJ did rely on the observers' notes, he also set forth additional bases for accepting the observers' accounts of the incidents over conflicting reports of the captains.

given greater credit because he would risk losing his license if he lied, he had no history of violations, and he fully cooperated with the investigation.  *Id.* at 31-32.  While Plaintiffs assert that the ALJ "discredited the Captain's testimony based on pure speculation or no reason at all," Pls.' Mem. at 32, a review of the ALJ's decision demonstrates that this characterization is not accurate. Rather, the ALJ explained that because Black and the fishing master had different duties, they were often stationed on different places on the vessel.  I.A.84 at 0001429.  As the ALJ noted, Morikawa's accounts "indicated several instance that the Captain was not always on the bridge during the first part of the sets, particularly in the early morning."  *Id.*  Further, the ALJ noted that because the fishing master was responsible for deploying the nets when fish were located, sleep variances between the fishing master and Black could occur. *Id.* at 0001429-30.  As such, the ALJ concluded "it is clear Captain Black might not have observed some/most of the illegal actions of the fishing master."  *Id.* at 0001430.

This conclusion was supported by Morikawa's accounts that indicated several instances when Black was not on the bridge during the first part of the sets, particularly in the early morning. *Id.*  Black denied in his testimony that he was asleep during the early morning sets.  I.C.108 at 0002823.  Further, when asked if he got up for every set, Black responded: "Every – yeah, I wrote every set in, every single set in the morning. It was my time, it was my position.  If you want to take and check the position, you might see a very slight difference in the position itself. There shouldn't be a difference in time because at that time when he let go, we start right in the position." *Id.*  The ALJ noted that Black in his denial indicated that he wrote every set in the log sheet, which the ALJ credited.  I.A.84 at 0001430.  However, he concluded "the source of such information more likely than not came from other members of the crew."  *Id.*  Ultimately, in addressing the conflicting testimony between Morikawa and Black regarding Black's presence during some of

the sets, the ALJ accepted Morikawa's accounts that Black was not present over Black's accounts that he was always present, noting that Black as a named party had "an ongoing incentive to minimize and/or fail to recall those instances where the vessel did engage in such activities." *Id.* Finally, the ALJ noted that he found Black's testimony to be "generally forthright, but clearly slanted in his employer's favor." *Id.*   The ALJ adequately explained his conclusion that Morikawa's account should be credited over Black's account, a conclusion which was supported by the evidence before him.   Accordingly, the Court finds no reason to set aside the ALJ's acceptance of Morikawa's testimony over that of Black with respect to Black's presence during some of the sets and, relatedly, Morikawa's descriptions of the sets at issue.

Finally, Plaintiffs argue that the ALJ "improperly flatly rejected all accounts by the translator based on an assumed bias because of the translator's employment status." Pls.' Mem. at 35.  Further, Plaintiffs assert "the ALJ failed to plausibly explain his conclusion that Mr. Cahyana's testimony was not credible in some circumstances but acceptable in others absent any impeachment efforts by NOAA or contradictory evidence." *Id.* at 33.  A review of the ALJ's findings demonstrates that the ALJ properly considered the relevant information provided by Cahyana and credited Morikawa's accounts of the violations over the conflicting accounts given by Cahyana.  Indeed, the ALJ noted, "Mr. Cahyana was able to provide detailed accounts of each of the violations and the particulars surrounding those violations, but could not do so for any other days or sets made by the vessel."  I.A.84 at 0001431.  The ALJ contrasted Cahyana's testimony with that of Morikawa, who kept contemporaneous notes of the each of the sets, and found Cahyana's "selective ability to recall detailed specifics of the alleged violations is dubious at best." *Id.*  Further, the ALJ noted that Cahyana's function was to be the interpreter on the vessel, whereas Morikawa's role was dedicated to observing the fishing activities.  *Id.*  Finally, the ALJ noted that

Cahyana was a current employee of the American Triumph and just entered into a new contract to serve as interpreter of the vessel. *Id.* Finally, the ALJ noted that Morikawa's contemporaneous notes indicated that on one occasion during the trip, Morikawa pointed out a raft to Cahyana and Cahyana told Morikawa not to tell Black about the raft. *Id.*

After considering all this evidence, the ALJ determined that the information about the violations provided by Morikawa in his contemporaneous notes and in his testimony should be credited over that of Cahyana. Plaintiffs provide no basis for the Court to overturn that determination based on the ALJ's reasoned explanation set forth in his decision. Accordingly, for the reasons described, the Court finds that the ALJ's credibility determinations are not hopelessly incredible, self-contradictory, or patently insupportable, but rather are supported by substantial evidence in the record. *See Noel Canning*, 705 F.3d at 495. Further, the Court finds that the ALJ's decision to credit information provided by Morikawa of the violations over the conflicting accounts given by Black and Morikawa was supported by the record and was properly explained by the ALJ. As such, the Court finds no reason to disturb this portion of the ALJ's decision nor does the Court find that the Administrator erred in accepting the credibility determinations as part of the Secretary's final decision in this matter.

            b.  ALJ's Determination as to Proven Counts

Plaintiffs also raise specific objections to the ALJ's findings with respect to each of the counts that the ALJ found proven. The ALJ found that during the FAD closure period, the AT Plaintiffs had violated the FAD Regulation by servicing a FAD on one occasion, making a set within one nautical mile of a FAD on three occasions, and making a set on a FAD on three

occasions.[15]   The ALJ found in one instance that it was not proven that the AT Plaintiffs made a

set within one nautical mile of a FAD.   I.A.84 at 0001442.   As described below, Plaintiffs

essentially reiterate arguments soundly rejected by the ALJ.   This Court will not re-weigh the

evidence and substitute its own judgment for that of the ALJ.   Further, the Court notes that it has

reviewed the evidence relied upon by the ALJ which in each instance primarily includes

Morikawa's testimony and his contemporaneous notes taken during the trip.   *See generally* I.A.84

at 0001432-50.   In each instance, this evidence provides substantial support for the ALJ's

conclusion.   The crux of Plaintiffs' argument is that the ALJ should have discounted Morikawa's

accounts of the incidents and instead accepted other evidence in the record.   As such, the Court

shall focus on Plaintiffs' objections to the ALJ's findings in its discussion.

With respect to Count 1, the ALJ found that it was proven that on August 28, 2009, AT

Plaintiffs violated the FAD Regulation by servicing a FAD.   *See id.* at 0001432-36.   Specifically,

the ALJ found that the fishing master swapped out a radio beacon from another vessel on a FAD

for a radio beacon belonging to the American Triumph and then re-deployed the FAD.   *Id.*   While

Plaintiffs contend that the ALJ improperly discounted testimony from Black and Cahyana that

contradicted Morikawa's testimony that the vessel actually swapped the radio buoy on the FAD,

the ALJ provided a detailed explanation to support this finding.   Pls.' Mem. at 36.   The ALJ

provided a detailed account of the evidence presented by both sides as to this issue, noting "[t]he

central question is whether [Plaintiffs] in fact exchanged the buoy or merely returned the FAD to

the water at Captain Black's explicit direction."   I.A.84 at 0001434.   The ALJ recounted both

---

[15] The ALJ also found in one instance (Count 3) that it was not proven that the AT Plaintiffs made a set within one nautical mile of a FAD.   I.A.84 at 0001442.   The parties do not contest this finding in their cross-motions so the Court shall not further address it.

Black's and Cahyana's accounts of the incident, including the fact that both testified that the radio beacon was not changed because Black instructed the crew not to do so.  *Id.* at 0001433. Ultimately, however, the ALJ credited Morikawa's account of the events, finding his testimony was detailed and supported by contemporaneously generated documents.  *Id.*  Further, the ALJ noted that Morikawa's diary included a "highly detailed depiction of this event, containing specificity and more details than were elicited by either party during the hearing."  *Id.*  After balancing all the evidence, the ALJ expressly accepted Morikawa's account that the radio beacon was in fact replaced and provided an adequate explanation for reaching this conclusion.  *See id.* at 0001432-36.  As such, the Court concludes that the ALJ's finding with respect to Count 1 against the AT Plaintiffs was not arbitrary or capricious and that it was supported by substantial evidence.

Turning to Count 2, the ALJ found that Plaintiffs made a set within 100 meters of a FAD on August 18, 2009, in violation of the FAD Regulation.  Plaintiffs contend that the ALJ erroneously weighed the evidence because there were inconsistencies in Morikawa's account of the events.  Pls.' Mem. at 36.  First, Plaintiffs point to the differing accounts given by Morikawa and Cahyana with respect to whether there actually was a raft.  *Id.* at 36-37.  The ALJ fully discussed these accounts, including Cahyana's statement that he could not see the FAD even after he went to the mast and used bigger binoculars.  I.A.84 at 0001437-38 ("Even if one accepted Mr. Cahyana's testimony as credible (which for the reasons given above, I do not), at best it only indicates he did not personally see the raft and that he did not hear from anyone else on the boat that they saw a raft.").  The ALJ noted that Morikawa testified that Cahyana certainly saw the FAD and "tried to talk Mr. Morikawa into not telling Captain Black." *Id.* at 0001436.  Further, Plaintiffs point to an alleged discrepancy in Morikawa's daily log with respect to this event, an argument that the ALJ weighed in reaching his determination.  *Id.* at 0001437.  After expressly considering

45

this evidence, the ALJ found that "[t]he balance of the evidence favors the Agency's position." *Id.* The Court notes that while Plaintiffs do cite to testimony from Black in support of the notion that there was no FAD in the vicinity, that testimony is not expressly cited in the ALJ's decision. *See* I.C.108 at 002823 (testimony of Black that no FAD was observed by him or by anyone when the set was made). However, in the credibility determination with respect to Count 2, the ALJ expressly found "Mr. Morikawa's account is more credible than Mr. Cahyana's and Captain Black's." I.A.84 at 0001437. As such, the Court finds that the ALJ properly considered the evidence before him with respect to Count 2 and the Court finds that the ALJ's determination that the violation was proven is supported by substantial evidence.

Turning next to Count 4, the ALJ found that Plaintiffs set a net within one nautical mile of a FAD on August 24, 2009, in violation of the FAD Regulation. Plaintiffs again raise an issue with the coding of the incident in Morikawa's logbook. Specifically, Plaintiffs argue that Morikawa "said that the FAD was near a 'free school' of tuna and his logbook showed an entry for Set #22 as a '2' the code for 'feeding on baitfish' but not the code for FAD association." Pls.' Mem. at 37. The ALJ fully addressed the coding issue in his decision and found Plaintiffs' reliance on it "not persuasive." I.A.84 at 0001443. Plaintiffs take issue with the fact that the ALJ accepted that the set was one for feeding on baitfish but nevertheless found it was unlawful. *See id.* at 0001443-44. However, as explained in the decision, the ALJ rejected the argument based solely on Cahyana's testimony of "the alleged impossibility of tuna feeding on bait fish in association with a raft/FAD." *Id.* at 0001444. Instead, the ALJ found that Cahyana's and Morikawa's testimony was not inconsistent. Rather, the ALJ found that a set could be made on tuna "feeding on baitfish" within one nautical mile of a FAD, as in this instance. *Id.* at 0001443-44. The ALJ also noted that the Agency had not alleged that the set was made on the FAD itself. *Id.* at 0001443.

46

As such, the Court finds that the ALJ properly considered the evidence before him with respect to Count 4 and the Court finds that his determination that the violation was proven is not arbitrary, capricious, or an abuse of discretion.  Rather, the finding is supported by substantial evidence in the record.

With respect to Count 5, the ALJ found that Plaintiffs set a net within one nautical mile of a FAD on September 4, 2009, in violation of the FAD Regulation.  Plaintiffs first contend that the ALJ did not cite to testimony from Cahyana, consistent with Morikawa's testimony, that a "track finder" cannot be used to find a buoy because it does not give distance.  However, the ALJ did reference the cited testimony from Cahyana.  *See* I.A.84 at 0001445.  Cahyana explained in the cited testimony: "We press the button, then on that beacon give you a signal. If you had a signal and sound like beep, beep, beep, beep, beep, beep, like that, and if you have a big signal, that mean the buoy's close. Big power on the signal mean it's close. If you have small signal, that mean it more than ten mile." I.C.108 at 0002811.  Cahyana went on to explain that from the track finder you can find the direction, but not the distance of the buoy.  *Id.*  This information is not inconsistent with the ALJ's finding: "1) the vessel (and Mr. Morikawa) could determine the direction of the specific buoy by its frequency using the track finder and 2) the strength of the signal received gave a *relative indication* of the distance (i.e., the closer the buoy-the stronger the signal)."  I.A.84 at 0001445 (emphasis added).  Further, Plaintiffs assert that the ALJ rejected Black's explanation of the set without an explanation and further indicated that the evidence supported a finding that this was a set made on "fish-under-the-boat."  Pls.' Mem. at 39-40.  However, the ALJ clearly set forth his reasons for crediting Morikawa's account over Black's account.  Namely, the ALJ found that Black woke up as the set was underway.  I.A.84 at 0001445-46, 0001446 n.29.  As such, the Court

47

concludes that there is no basis to set aside the ALJ's determination with respect to Count 5 because the finding was supported by substantial evidence.

Turning to Count 6, the ALJ found that the Plaintiffs set a net on a raft in order to catch fish that had aggregated in association with the raft on August 15, 2009, in violation of the FAD Regulation. Plaintiffs argue that the ALJ should have discredited Morikawa's testimony that he saw the FAD in question because Morikawa also testified that it was dark at the time of the set. Plaintiffs also point to Morikawa's testimony that he did not know where the buoy was and his concession that it could have been 10 miles away. Rather, Plaintiffs argue that the ALJ should have accepted Black's testimony that this was a set made on "fish-under-the-boat." Pls.' Mem. at 39-41.

The ALJ properly considered each of Plaintiffs' arguments in his decision and rejected each with explanation. First, the ALJ did not discredit Morikawa's account that he saw the FAD in the dark because the record reflects that the vessel could find its rafts by using the track finder to find the beacon on the raft, that Morikawa indicated that there was a 29 minute lapse between when Morikawa was aware that the vessel was searching for one of its buoys and when it actually located the same, and that Morikawa explained that he could see the buoy because of the lights coming off of the vessel's tower and working lights. I.A.84 at 0001447-48. The ALJ found that with respect to Morikawa's testimony regarding the location of the buoy, Morikawa "was not speaking about that particular buoy but was stating that the range finder to track the buoy does not give discrete distance but picks up signals from up to 10 miles away," *id.* at 0001533, which is not inconsistent with a reading of the testimony in response to the question about the display on the track finder, I.C.102 at 0002346-47. While Plaintiffs' argue that the ALJ should have accepted Black's and Cahyana's testimony that the FAD set did not occur, and that this set was consistent

48

with a fish-under-the-boat set, the ALJ accepted Morikawa's account of the events at issue in light of conflicting testimony. *See* I.A.84 at 0001446-48. The Court finds that the ALJ's decision was supported by substantial evidence because the ALJ relied on the account provided by Morikawa, which the ALJ deemed more credible.

Turning to Count 7, the ALJ found that Plaintiffs set a net on a raft on August 17, 2009, in violation of the FAD Regulation. Plaintiffs contend that the evidence supports the conclusion that this was a set on "fish-under-the-boat" that did not violate the FAD Regulation. Pls.' Mem. 40-41. However, Morikawa provided a conflicting account of the events, indicating that he spotted a buoy and raft at 04:58, and that the vessel deployed fish aggregating lights and deployed a workboat with its own aggregating lights. The vessel made a set at approximately 05:33. I.A.84 at 0001448-49. In light of the conflicting accounts regarding whether a raft was involved, the ALJ credited Morikawa's account of the events. *Id.* at 0001449. The Court finds that the conclusion of the ALJ was supported by substantial evidence given Morikawa's testimony and records despite the fact that Plaintiffs presented a conflicting account.

Finally, with respect to Count 8, the ALJ found that Plaintiffs set a net on or near a raft to capture fish that had aggregated in association with the raft on September 4, 2009, in violation of the FAD Regulation. Plaintiffs contend that the ALJ should not have credited Morikawa's account of the events at issue over the conflicting accounts presented by Black and Cahyana. First, Plaintiffs point to the fact that Morikawa coded the set as one made on "schoolfish feeding on baitfish" as a reason for discrediting Morikawa's account. Pls.' Mem. at 38. The ALJ addressed this issue and supported his finding by pointing to Morikawa's testimony that the set was made on "a free school of tuna that was feeding on bait fish near a raft." I.A.84 at 0001449. Further, the ALJ noted that Morikawa indicated that the vessel maneuvered near the raft to separate the tuna

49

from the raft before making the set. *Id.* Finally, the ALJ indicated that while both Cahyana and Black specified that they did not see the raft, the ALJ concluded that Morikawa's account was more credible. *Id.* at 0001450. The Court finds that the ALJ's determination was supported by substantial evidence in the record given that he relied on Morikawa's account of the events at issue and described his reasons for doing so.

For the reasons set forth above, the Court concludes that the ALJ's findings, ultimately accepted by the Administrator as the Secretary's final decision, were supported by substantial evidence and were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Indeed, in each instance, the ALJ was presented with conflicting evidence and chose to credit certain evidence over other evidence, and provided his reasons for doing so. As such, the Court shall deny Plaintiffs' request to set aside these findings and shall enter judgment in favor of Defendants with respect to Counts 1-2 and 4-8 against AT Plaintiffs.

### 2. *Consolidated Plaintiffs*

Plaintiffs also raise specific objections to the ALJ's findings with respect to each count alleged against the Consolidated Plaintiffs, which Plaintiffs argue are not supported by substantial evidence. The Court shall address each of Plaintiffs' arguments with respect to each of the Consolidated Plaintiffs. The Court shall first address the violations related to the FAD Regulation and then the Court shall address the MMPA violations. As an initial matter, the Court notes that the ALJ had the opportunity to observe the demeanor of the witnesses at the hearing and was able to consider this factor in making his findings.

### a. FAD Regulation Violations

#### i. Sea Quest Plaintiffs (Counts 1-2)

The ALJ found that the Sea Quest Plaintiffs violated the FAD Regulation on August 14, 2009 (Count 1), and on September 17, 2009 (Count 2), based on the vessel's use of lights to make a set on fish that had aggregated overnight under the vessel.  In both instances, the observer on board reported that he observed auxiliary workboats with lights in the water near the vessel before the set was made.  II.A.100 at 0005515, 0005517.  With respect to these two counts, Plaintiffs argue that the ALJ should have credited testimony from the vessel's captain, Plaintiff Freitas, that the lights were used for safety reasons and not for the purpose of aggregating fish.  Further, Plaintiffs argue that there was conflicting testimony regarding which lights were used.  Pls.' Mem. at 42-43.  Ultimately, Plaintiffs contend that both sets were permissible sets on "fish-under-the-boat."

In both instances the ALJ credited the testimony and contemporaneous records of the observer, Kun Iohp, in reaching his conclusions.  With respect to Count 1, the ALJ concluded that "the vessel used lights overnight in an effort to aggregate fish while it drifted and then deployed auxiliary boats the next morning with submerged lights to capture the aggregated fish."  II.A.100 at 0005516.  With respect to Count 2, the ALJ found that the vessel "used lights in an effort to hold the fish which had aggregated overnight under the vessel on its auxiliary boats to capture those fish in the set."  *Id.* at 0005517.

Plaintiffs point to Plaintiff Freitas' testimony and a memorandum from an interview indicating that Freitas maintained that the vessel never used submerged lights during the trip and rather, the only lights used at that time were above-water lights on the vessel and the workboats. *See* II.C.121 at 0007298; II.E.129-V at 0009806.  However, the ALJ cited to Freitas' testimony that they used lights on the workboat that were submerged about 2 feet, but not the aggregating lights that are usually dropped about 20 feet below the surface of the water.  The ALJ's analysis

51

focused on the use of the lights submerged 2 feet under the water.  While Freitas contended that the primary purpose for using those lights was for safety purposes and not for fish aggregating purposes, the ALJ noted that "Freitas acknowledged that [those] 'drop lights' [on the auxiliary boats] were used at least partly in the hopes of keeping fish in place while the main vessel performed a set around the work boats." II.A.100 at 0005516.  Ultimately, the ALJ found Freitas' general denial that the vessel did not use lights for the purpose of aggregating fish not credible, particularly in light of Freitas' concession on the point.  *Id.* at 0005516.  As such, the Court finds each conclusion was supported by substantial evidence in the record, including the testimony of Iohp and his contemporaneous records.

### ii.   Pacific Ranger Plaintiffs (Count 1)

The ALJ found that the Pacific Ranger Plaintiffs violated the FAD Regulation by making a set on tuna that had aggregated under the vessel overnight on September 30, 2009.  Specifically, the ALJ found that the use of lights on an auxiliary boat during the set to hold the fish in place converted the vessel into a FAD.  Plaintiffs argue that the ALJ incorrectly rejected the testimony of Plaintiff Zolezzi, the vessel's captain, that the workboat's underwater lights were only turned on for a brief period of time, one to two minutes, until Zolezzi instructed the fishing master to turn them off.  Pls.' Mem. at 44.

The ALJ relied on the testimony and records of Auto'o Siliomea, the observer, to support his finding that the violation occurred.  Specifically, the log kept by Siliomea indicated with respect to the set at issue: "They used fish aggregatting [sic] light, and after the rings up. I saw a drifted log near the skiff. I saw auxiliary boat #6 was drifted with fish aggregatting [sic] light and the vessel made a set around it." II.E.128-5 at 0008296.  Siliomea also testified that the light deployed by the auxiliary boat was deep in the sea.  II.C.115 at 0006616.

The ALJ rejected Zolezzi's contention that the lights were on for a short period of time based on Siliomea's account of the events at issue. Ultimately, the ALJ found, "Credible evidence . . . indicates the F/V Pacific Ranger used lights in an effort to hold the fish which had aggregated overnight under the vessel. Moreover, the F/V Pacific Ranger used its auxiliary boat lights to hold those fish so a set could be made." II.A.100 at 0005518. While Plaintiffs correctly contend that the ALJ does not discuss whether lights were used to aggregate the fish under the *vessel* overnight, the ALJ found a violation of FAD Regulation based on the use of submerged lights under the *workboat* as described by Siliomea. Siliomea's specific account that the boat made a set after using aggregating lights on the workboat to hold the fish in place provides substantial support for the ALJ's conclusion that the Pacific Ranger Plaintiffs violated the FAD Regulation. As such, the Court concludes that ALJ's finding was supported by substantial evidence in the record.

### iii.   Ocean Conquest Plaintiffs (Counts 2-3)

The ALJ found that the Ocean Conquest Plaintiffs violated the FAD Regulation on September 24, and September 25, 2009, by using lights during the night in one instance and lights on its auxiliary boats to hold the fish in place in order to make a set on the fish in both instances. Plaintiffs argue, "[w]hile the evidence supports the finding that lights of some sort were used because of the fishing master's belief that they would hold the fish in place, NOAA presented no evidence that they did in fact *achieve that purpose*." Pls.' Mem. at 45. As Defendants properly note, NOAA is not required to prove that the use of the lights was effective, only that Plaintiffs made a set around an artificial or natural floating object, that is capable of aggregating fish, or any objects used for that purpose. Defs.' Opp'n & Cross-Mot. at 43. Plaintiffs contend that the evidence proves only that sets were made on fish that naturally aggregated under vessels overnight and that the FAD Regulation "raises the question of whether 'holding' fish by a workboat is

53

considered purposeful aggregation or not." Pls.' Mem. at 45. The ALJ relied on testimony by Plaintiff Maughan, the vessel's captain, who claimed that lights in the water do not attract fish under the boat, but acknowledged that the Taiwanese fishing masters believe that if they put the lights in the water the fish will stay by the boats. II.A.100 at 0005487. Further, the ALJ, pointing to the captain's testimony, indicated: "Captain Maughan stated that the fishing master in these instances used lights in the water because of that belief." *Id.* at 0005519. As such, Plaintiffs' argument that their conduct did not fall within the range of *purposeful* conduct prohibited by the FAD Regulation is without merit. The ALJ, relying on the testimony of Plaintiff Maughan, found that Plaintiffs "used lights in an effort to keep the aggregated fish under the workboats while the main vessel made a set." *Id.* Further, relying on evidence deemed credible from the on-board observer, Anthony Lioliomola, the ALJ set forth a substantial basis for making his findings on both counts. Accordingly, the Court finds each conclusion was supported by substantial evidence in the record.

### iv. Ocean Encounter Plaintiffs (Counts 5-9)

The ALJ found proven that Plaintiffs violated the FAD Regulation on September 18, September 20, September 21, September 22, and September 23, 2009, by making sets on tuna that had aggregated under the main vessel overnight. The ALJ found in each instance that the use of lights during the night and/or the use of lights on the auxiliary boats to hold the fish in place turned the vessel into a FAD. Plaintiffs argue that in each instance the ALJ erroneously relied on the testimony of the inexperienced observer over the account provided by the experienced captain of the vessel. Pls.' Mem. at 46-47. In each instance, the ALJ relied on the testimony of Chris Nare, the on-board observer, to support his finding that Plaintiffs used submerged lights on the auxiliary boats prior to making the sets. *See* II.A.100 at 0005522-26. Plaintiffs contend that the ALJ should

have credited the account of Plaintiff Bass, the vessel's captain, over that of Nare.  As the ALJ

noted, Bass did not testify at the hearing.  However, his interview with Special Agent Charles

Raterman and follow-up responses to questions via e-mail were considered.   Indeed, Bass denied

that the vessel set on any FADs or used any underwater lights during the period of the alleged

violations.

The ALJ accepted that Bass told the investigator that Nare was inexperienced, it was his

first time away from home and his first time on a ship, and that he had "no clue" how to complete

forms, make proper log entries, identify species, measure tuna, or observe or access anything. *Id.*

at 0005655.  However, the ALJ accepted this finding as to the fact that Bass made these statements,

but rejected it to the extent that the finding implied that Nare's documents and/or testimony lacked

credibility.   *Id.*   Instead, the ALJ concluded that Nare's detailed account and records provided

credible evidence to support his conclusion even in light of the conflicting account of Bass who

did not testify.  As such, the Court finds that the ALJ's decisions as to each count were supported

by substantial evidence.

### v.   Sea Honor Plaintiffs (Counts 1-2)

The ALJ found that Plaintiffs violated the FAD Regulation by servicing/deploying a FAD

on September 28, and September 30, 2009.  Plaintiffs contend that the ALJ improperly relied on

the accounts provided by the observer and failed to weigh that evidence against the contradictory

account provided by the vessel's captain.  Indeed, the ALJ pointed to the testimony of Plaintiff

Magellan, the vessel's captain, denying that the vessel deployed a FAD as alleged.  *See* II.A.100

at 0005527.  However, the ALJ relied on the testimony and observer reports of John Charles Belei,

the trained observer, to support his conclusions with respect to each count.  The fact that the ALJ

chose to credit this account over that of the vessel's captain who was not in charge of the fishing

operations does not provide a basis to overturn the ALJ's determination. *Id.* at 0005499.  As such, the Court finds that the ALJ's decisions as to each count were supported by substantial evidence, including the detailed observer reports and testimony of Belei.

   b. <u>MMPA Violations</u>

    i. Ocean Quest Plaintiffs (Count 1)

  The ALJ found that Plaintiffs violated the MMPA on September 18, 2009, by intentionally making a set on a live whale in order to capture tuna associated with that whale.  Plaintiffs contend that the ALJ improperly found that Plaintiffs intentionally set on a whale because the evidence did not support a finding that anyone but the observer saw the whale before the set was made.  Pls.' Mem. at 50-51.  Indeed, the ALJ recounted that Lioliomola, the observer, saw a whale with tuna around it about 100 to 200 meters from the vessel without the aid of binoculars.  II.A.100 at 0005506.  A set was made and the whale was caught in the net, at which time the fishing master directed the auxiliary boat to chase the whale out of the net.  *Id.*  The ALJ noted that "Lioliomola did not assert that anyone else on the vessel saw the whale before the set was made." *Id.*  The fishing master (who did not testify before the ALJ) and the captain both denied seeing the whale before the set was made. *Id.* at 0005506-07.

  The ALJ relied on the Lioliomola's account that the fishing master told him that a "few minutes after the deployment of the winch, *we* saw the whale in the net," which the ALJ concluded supported the finding that "some unspecified people on the boat saw the whale in the net as the winch was engaged. " *Id.* at 0005506.  Further, the ALJ found that "[i]t is simply implausible given the credible eyewitness testimony of Mr. Lioliomola that the crew did not see the whale before the set was made given the distance of the whale from the vessel." *Id.* at 0005507.  Here, Plaintiffs contend that "NOAA presented no evidence that the fishing master in fact saw the whale

before the set." Pls.' Mem. at 52.  The ALJ rejected the contention that the observer was the only

person on the vessel who saw the whale near the tuna before the set based largely on the observer's

report that the whale was 100 to 200 meters from the vessel and viewable without binoculars.   As

noted by Defendants, Plaintiff Maughan, the vessel's captain, indicated that he had "nothing to do

with setting the nets or saying [sic] about fish," which was the responsibility of the fishing master.

*Id.* at 0005487.  Without testimony from the fishing master himself, the ALJ credited Lioliomola's

account of the events and, based on the evidence presented by Lioliomola through testimony and

observer reports, found it implausible that no one on the crew saw the nearby whale with the tuna

before making the set.  This conclusion is supported by substantial evidence in the record and, as

such, the Court shall not set aside the ALJ's finding that Plaintiffs violated the MMPA by

intentionally making set on a live whale.

### ii.  Ocean Encounter Plaintiffs (Counts 1-4)

The ALJ found that Plaintiffs violated the MMPA on September 17, September 24, and

twice on September 25, 2009, when Plaintiffs made a set on a live whale in connection with the

vessel's efforts to capture tuna associated with the whale.  It is undisputed with respect to each

count that the whale was released and not injured.  Specifically, Plaintiffs call into question the

following explanation provided by the ALJ:

> Throughout all of these encounters with whales, two common threads arise from
> [Plaintiffs'] arguments – (1) in no instance did the fishing master see a whale prior
> to the set; and (2) apparently none of the crewmembers who saw the whale notified
> the fishing master of the whale's presence. However, it is more likely than not that
> all of the crew intuitively understood that they were not to notify the fishing master
> of such circumstances since that notification would likely reduce the overall tuna
> catch and adversely affect their share of the proceeds.

Pls.' Mem. at 54 (quoting II.A.100 at 0005508).  The ALJ credited testimony from Nare, the on-

board observer, with respect to each of the four counts.  With respect to Count 1, the ALJ relied

on Nare's account that he spotted the whale with the tuna and estimated the whale was 100 to 200 meters away.   Further, Nare believed other crew members saw the whale, specifically one crewmember on the helideck.  II.A.100 at 0005508.  In reaching his finding on Count 1, the ALJ noted, "Given this distance from the whale/tuna, it simply stretches credulity to conclude that the fishing master did not see the whale with the tuna prior to the set."  *Id.* at 0005508.  With respect to Count 2, Nare indicated that before the set was made, he could "clearly see the whale with the tuna, which was bigger than the tuna and it was spouting." *Id.* at 005509.  With respect to Count 3, Nare stated that he saw a whale approximately 100 to 300 meters from the vessel and that the vessel made a set on the whale and the associated tuna seven minutes later.  *Id.* at 0005510.  With respect to Count 4, Nare heard the watchman in the crow's nest tell the fishing master that there was a whale in the school, but the fishing master made a set anyway.  *Id.* at 0005511.  In reaching his determinations with Counts 2, 3, and 4, the ALJ specifically found that Plaintiffs made a set on a "clearly visible" whale.  *Id.*

Neither the captain of the vessel nor the fishing master testified at the hearing.  However, Plaintiffs Bass indicated in his interview with Special Agent Raterman, that he did not intentionally set on whales.  Plaintiffs argue that the ALJ's conclusion that the crew would not inform the fishing master if they saw a whale is contradicted by the fact that the crew chased the whales out of the net, in some instances also losing the tuna that was in the net.  Further, Plaintiffs argue that the ALJ should have credited the captain's statements over those of Nare who was inexperienced. Again, the ALJ accepted that Plaintiff Bass, the captain, had reported to the NOAA investigator that Nare was inexperienced, but the ALJ rejected this finding to the extent that it states or implies that Nare's documents and testimony were lacking in credibility.  *Id.* at 0005655.  Instead, the ALJ, relying on the testimony and observer reports of Nare, found that it was implausible that Nare

58

was the only person on the vessel to see the whale before the sets were made, in light of the specific facts provided by Nare with respect to each set.  The ALJ's decision to credit this testimony over the statements of Bass, who did not testify, is reasonable.  As such, the Court finds that the ALJ's decisions as to each MMPA account were supported by substantial evidence, namely the statements and testimony of Nare.

In sum, the Court finds that substantial evidence supports each of the ALJ's findings that the specific counts were proven against each of the six sets of Plaintiffs.  Indeed, the D.C. Circuit has recognized an agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005).  Here, Plaintiffs' attempt to point to plausible alternative interpretations of the evidence does not negate the fact that substantial evidence supports the decision reached by the ALJ.  Further, for the reasons set forth, Plaintiffs have failed to establish that the ALJ's decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Relatedly, the Court finds that the Administrator's adoption of the ALJ's conclusions as the Secretary's final decisions in this matter was not arbitrary or capricious.

### F.    Civil Penalty Assessments

Finally, Plaintiffs argue that the civil penalty amounts are excessive. Specifically, Plaintiffs argue that the civil penalties, totaling nearly $1.5 million, are improper because the FAD Regulation was a new law, made effective immediately, and it was unclear what conduct was prohibited.  Further, Plaintiffs argue that the MMPA penalties bear no relation to the violations because Plaintiffs were never found to violate the statute before and no whales were harmed or killed. Pls.' Mem. at 57-58.

Penalties for violations of the FAD Regulation are the same as those under the Magnuson Act. *See* 16 U.S.C. § 6905(c) (establishing that any person who violates the United States' implementation of the Western and Central Pacific Fisheries Convention is subject to the same penalties as provided in the Magnuson Act). The 1990 amendments to the Magnuson-Stevens Act increased the civil penalties from $25,000 to $100,000 per violation. 16 U.S.C. § 1858(a). Furthermore, the Magnuson Act's civil penalties are subject to the Federal Civil Penalties Inflation Adjustment Act of 1990 and have increased several times since then. *See* Civil Monetary Penalties; Adjustment for Inflation, 73 Fed. Reg. 75,321, 75,322 (Dec. 11, 2008). Accordingly, the maximum penalty per violation of the FAD Regulation at the time of Plaintiffs' conduct was $140,000. *Id.*; 15 C.F.R. § 6.4(f)(14). The AT Plaintiffs were thus subject to a statutory maximum penalty of $980,000 for their seven proven FAD violations; the Pacific Ranger Plaintiffs were subject to a total maximum of $140,000 for their proven FAD violation; the Ocean Conquest Plaintiffs were subject to a total maximum of $280,000 for their two proven FAD violations; the Ocean Encounter Plaintiffs were subject to a total maximum of $700,000 for their five proven FAD violations; and the Sea Honor Plaintiffs were subject to a total maximum of $280,000 for their two proven FAD violations. *See* II.A.100 at 5533.

The MMPA provides a maximum civil penalty of $10,000 for a proven violation. 16 U.S.C. § 1375. The maximum penalty per violation at the time of Plaintiffs' conduct was $11,000 under the Federal Civil Penalties Inflation Adjustment Act of 1990.  73 Fed. Reg. at 75,321; 15 C.F.R. § 6.4(f)(10). The Ocean Conquest Plaintiffs were thus subject to a maximum penalty of $11,000 for their proven MMPA violation and the Ocean Encounter Plaintiffs were subject to a total maximum penalty of $44,000 for their four proven MMPA violations. *See* II.A.100 at 5533-34.

Ultimately, the ALJ imposed the following penalties for the proven counts: (1) $562,068.27 against the AT Plaintiffs for the seven violations of the FAD Regulation (the maximum penalty for Counts 6 and 8, and below the maximum for Counts 1-2, 4-5, and 7), I.A.84 at 0001477; (2) $147,959.68 against the Sea Quest Plaintiffs for two violations of the FAD Regulation (below the maximum penalty and the agency's request for both counts), II.A.100 at 0005566; (3) $50,000 against the Sea Honor Plaintiffs for two violations of the FAD Regulation (below the maximum penalty and the agency's request for both counts), *id.*; (4) $41,699.50 against the Pacific Ranger Plaintiffs for one violation of FAD Regulation (below the maximum penalty and the agency's request), *id.*; (5) $215,776.77 against the Ocean Conquest Plaintiffs for one violation of the MMPA and two violations of the FAD Regulation (the maximum penalty for the MMPA violation, and below the maximum penalty and the agency's request the two FAD Regulation violations), *id.* at 0005567; and (6) $497,617.98 against the Ocean Encounter Plaintiffs for four violations of the MMPA and five violations of the FAD Regulation (the maximum penalty for each of the four MMPA violations, and below the maximum penalty and the agency's request the five FAD Regulation violations), *id.*

Plaintiffs argue that the evidence weighed by the ALJ does not support the penalties assessed and that the penalties are "unconstitutionally excessive." Pls.' Mem. at 58. However, the Supreme Court has explained that a civil penalty violates the Excessive Fines Clause only if it "is grossly disproportional to the gravity of" the offense. *United States v. Hosep Krikor Bajakajian*, 524 U.S. 321, 337 (1998). Courts will not overturn a civil monetary penalty assessed by an agency "unless it is either 'unwarranted in law or . . . without justification in fact.'" *Dodge v. Comptroller of the Currency*, 744 F.3d 148, 161 (D.C. Cir. 2014) (quoting *Pharaon v. Bd. of Governors of Fed.*

*Reserve Sys.*, 135 F.3d 148, 155 (D.C. Cir. 1998)). Here, the ALJ's thorough analysis demonstrates that the penalties assessed were amply justified.

In fashioning penalties, the ALJ carefully considered the requisite factors, including: the statutory penalty range; the fact that Plaintiffs had no history of prior violations; the need to ensure that penalty assessments act as an effective deterrent; the harm to protected resources; the economic value of the illegally harvested tuna; the timing of the new FAD restrictions; and the Plaintiffs' degree of culpability, including, with respect to the MMPA violations, the fact that NOAA informed Plaintiffs that knowingly setting on marine mammals was unlawful but Plaintiffs did it anyway. *See* I.A.84 at 0001454-77; II.A.100 at 0005532-67.

Plaintiffs fail to identify any required factor that the ALJ entirely failed to consider and fail to demonstrate that the ALJ's weighing of the factors was arbitrary and capricious. Furthermore, the ALJ adjusted down the majority of the penalties sought by Defendants. Accordingly, the Court finds no valid basis for setting aside the ALJ's decision under "the deferential review of sanctions imposed by an implementing agency." *Dodge*, 744 F. 3d at 162.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' [18] Motion for Summary Judgment and DENIES Plaintiffs' [16] Motion for Summary Judgment. Specifically, the Court finds that NOAA complied with the notice requirement of the APA pursuant to 5 U.S.C. § 553(d) when it waived for good cause the 30-day notice period, published with the FAD Regulation. Further, the Court finds that the definition of a FAD as found in the regulation is not unconstitutionally vague, and that NOAA's definition of the term "incidentally" with respect to the MMPA is both reasonable and consistent with the language, structure, and purpose of the statute. With respect to the specific, alleged violations, the Court finds that substantial evidence

supports the ALJ's findings adopted as the final decision of the Secretary that Plaintiffs violated the FAD Regulation on 19 occasions and the MMPA on five occasions.  Further, the Court finds that the determinations are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Finally, the Court finds that the Agency's penalty assessments are supported by substantial evidence and not excessive.  Accordingly, judgment shall be entered for Defendants. An appropriate Order accompanies this Memorandum Opinion.

   ***This is a final, appealable order.***

                                                      _____/s/_____

                                                      COLLEEN KOLLAR-KOTELLY
                                                      United States District Judge